In Equity.

HORATIO W. BLOOD, et als.,

*vs.*

F. O. BEAL, Mayor, et als.

Penobscot.    Opinion March 1, 1905.

*Constitutional Law.   Municipal Indebtedness.   Equity Jurisdiction.   Municipal Corporations.   Passage of Order.   Assets.   Article XXII of the Amended Constitution of Maine.   R. S., c. 79, § 6, par. XI.*

1. The Supreme Judicial Court of Maine under its decisions and by virtue of its enlarged equity powers, is fully invested with jurisdiction to enable it to prevent a manifest violation of Article XXII of the Amended Constitution of the state.

2. Where the court is asked to enjoin and restrain a city from creating an indebtedness which, with its previous debts or liabilities, would place it beyond its debt limit under the Constitution, the statute giving full equity jurisdiction undoubtedly confers upon the court sufficient authority to restrain a violation of the fundamental law. Unless equity can intervene, the amendment can be transgressed with impunity. The court know of no other process by which the constitutional inhibition could be enforced against a liability created for a legal purpose.

3. Unlike a statute which applies only to a liability created for a "purpose not authorized by law," the constitutional amendment applies with equal force against a liability whether created for a legal or illegal purpose. It makes no distinction whatever in this respect. The court is clothed with ample jurisdiction to prevent it, whether the debt or liability, which is calculated to violate the constitutional prohibition, is created for a legal or illegal purpose. The purpose for which the debt incurred or contemplated is immaterial, if it exceeds the five per cent limitation specified in the amendment.

4. While punctuation cannot be regarded of paramount importance in the construction of a statute, or other written instrument, and should never be allowed to overturn what seems to be the plain meaning of the instrument, yet when it is so used as to enable the language to bear an interpretation which will make the whole instrument rational and self consistent, it is entitled to consideration as much as the language itself.

5.  Where the rules and orders of a city council provide that certain orders " shall not be passed unless two-thirds of the whole number of each branch of the city council vote in the affirmative, by a vote taken by yeas and nays," and the whole number composing the council of the city was twenty-one, and the number voting in the affirmative upon the passage of the order was ten, such order is void for want of the requisite number of votes.

6.  When money collected from taxes is paid into the city treasury, without appropriation for any particular purpose, such money becomes an asset of the city and may be used for any legitimate expenditure.

7.  A temporary loan in contemplation of Article XXII of the Amended Constitution, is one made for a temporary purpose to be paid during the municipal year in which it is made, from taxes assessed and collected within the same year. And if such loan although temporary in its inception, or any part thereof, is carried over, in any form, into the next municipal year, it then loses its temporary character and becomes a debt or liability of the city within the inhibition of the aforesaid Article of the Amended Constitution.

Equity. On report. Bill sustained. Decree in accordance with opinion.

Bill in equity brought by fourteen taxable inhabitants of the city of Bangor, under the provisions of R. S., chapter 79, section 6, paragraph XI, asking that F. O. Beal, as mayor, and H. O. Pierce, as treasurer, be restrained from paying out any money, and that a special committee appointed for the purpose, be restrained from making a contract, for the purchase of two steel spans for the Bangor and Brewer bridge, under the authority of a certain order passed by the city Common Council.

At the hearing before the Justice of the first instance, a temporary injunction was issued, and the case was reported to the Law Court to render such judgment as the legal rights of the parties require.

The case sufficiently appears in the opinion.

*Louis C. Stearns and T. D. Bailey,* for plaintiffs.

*E. C. Ryder and H. L. Fairbanks,* for defendants.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, SAVAGE, POWERS, SPEAR, JJ.

SPEAR, J. This is a bill in equity brought by fourteen taxable inhabitants of the city of Bangor, under Chapter 79, section 6, R. S.,

asking that F. O. Beal, as mayor, and H. O. Pierce, as treasurer, be restrained from paying out any money, and that a special committee appointed for the purpose be restrained from making a contract, for the purchase of two steel spans for the Bangor and Brewer bridge, under the authority of the following order passed by the city council, viz:

"In common council October 14, 1904, order for purchase of bridge spans. taken from the table by yes and nay vote. Order for appointment of committee to consist of Street Engineers, one alderman and the President of common council, to contract with the lowest bidder for the two spans as advertised for the Bangor and Brewer bridge, so called, as soon as a contract is signed with the Public Works Company for crossing. Passed by yes and nay vote."

The plaintiffs base their claim for an injunction upon two grounds: (1) because the common council in passing the order violated the rules adopted by it for its procedure when in session; and (2) because the consummation of a contract for the purchase of the two steel spans by the committee appointed, would create an indebtedness which, with its previous debts or liabilities, would place the city of Bangor beyond its debt limit under Article 22 of the amended constitution of the State.

The position of the defendants is (1) that the purpose of the contract being a proper one, and one which the city has a legal right to make, the court has no equity jurisdiction to enjoin the proceedings; (2) that if there were any irregularities in the passage of the order, it was simply a failure on the part of the lower board to observe its own rules, and that the result of the vote was the same as it would have been had there been a formal motion to reconsider; and (3) that the city has the constitutional right to enter into the contract contemplated by the order.

The first objection raised by the defendants is settled in favor of the petitioners in *Reynolds* v. *Waterville,* 92 Maine, 292.

This was a bill in equity brought by the plaintiffs, being 12 taxable inhabitants of the city of Waterville against the city, the city hall commission, created by special laws of 1897, and M. C. Foster & Son, who were alleged to have contracted with the city hall

commission for the erection of a city hall building in the city of Waterville.

The whole office of this commission was to make the contract in avoidance of the city debt limit for the erection of the city hall for the present use of, and ultimate payment by, the city. Such contract was consummated with M. C. Foster & Son, and of this transaction, Chief Justice Peters says; "These are all very commendable provisions, but only go to show the true relations which the city was to hold towards this city property, and indicating that the city was really to build the new hall as its own property. And does not the very mischief here arise which the constitutional amendment was designed to prevent, the city thus getting their hall in the present, and having thirty years of continuous annual taxations with which to pay for it?" But the Reynolds case only indirectly involved a contract which, as the court found, was calculated to load the city beyond its constitutional debt limit, while the case at bar, not indirectly, but directly involves such a contract. While the decisions promulgated before the adoption of the present constitutional amendment in 1877, and before the conferring of full equity jurisdiction upon the court in 1874, hold that an injunction will lie only to restrain a city or town from raising or paying out money for a purpose not authorized by law under the statute, *Johnson* v. *Thorndike,* 56 Maine, 32, yet the court, not only under the decision in the Reynolds case, but by virtue of its enlarged equity powers, is fully invested with jurisdiction to enable it to prevent a manifest violation of the constitutional provision referred to. In the Johnson case the statute gave special jurisdiction to prevent a violation of the statute. In the case at bar, the statute giving full equity jurisdiction undoubtedly confers upon the court sufficient authority to restrain a violation of the fundamental law. Unless equity can intervene, the amendment can be transgressed with impunity. We know of no other process by which the constitutional inhibition could be enforced against a liability created for a legal purpose.

But unlike the statute which applies only to a liability created for a "purpose not authorized by law", the constitutional amendment applies with equal force against a liability whether created for a legal

or illegal purpose.   It makes no distinction whatever in this respect. The court is clothed with ample jurisdiction to prevent it, whether the debt or liability, which is calculated to violate the constitutional prohibition, is created for a legal or illegal purpose.   The purpose for which the debt is incurred or contemplated is immaterial, if it exceeds the five per cent limitation specified in the amendment. Having jurisdiction, we now approach the consideration of the first ground, upon which the plaintiffs assert they are entitled to an injunction, that the parliamentary irregularities, involved in the final passage of the order, are fatal to its legality.   When considered in connection with the provisions of section 7 of the rules and orders of the city council this contention must prevail.   The mere omission of the common council to reconsider and take the order from the table in accordance with the usual parliamentary rule, of itself, was not the fatal point in the proceedings.

The record shows that the common council non-concurred with the board of alderman, in passing the order authorizing the contract for the purchase of the bridge spans, and referred it to the next city council.   The order was then returned to the board of aldermen who insisted upon their former action and asked for a committee of conference.   The common council, without any action by way of reconsidering or revoking the reference to the next city council, then concurred in the action of the aldermen and appointed conferees.   A week later the report of the conferees that they were unable to agree, was accepted in concurrence, and the appointment of new conferees refused by the common council.   Here the whole matter rested several months until Oct. 14, when the order was taken from the table by a yea and nay vote, ten voting yea and seven nay.

The formal defect in the parliamentary procedure would not necessarily be insurmountable, if the action of the city council had complied with the requirements of section 7 of the rules and orders above referred to.

Section 7 is as follows : "In the present and every future financial year, after the resolve making the annual appropriations shall have passed, no subsequent expenditure shall be authorized for any object, unless provision for the same shall be made by a specific transfer

from some of the appropriations contained in such annual resolve, or by expressly creating a city debt, in the latter of which case, the order shall not be passed unless two-thirds of the whole number of each branch of the city council vote in the affirmative, by a vote taken by yeas and nays."

No language can be plainer than the above. Laying aside all parliamentary informalities and assuming that the city council undertook to do, in a purely parliamentary way, just what this section permitted them to do, then it becomes a mere matter of mathematical calculation to determine whether the order, authorizing the contract, and an implied city debt to carry it into effect, was passsd in accordance with the rule.

The whole number composing the common council of the city of Bangor under their charter was twenty-one. The number voting in the affirmative upon the passage of the order in question was ten; but it is readily apparent that ten is not two-thirds of twenty-one. Therefore, if the order had been otherwise legally voted upon, it was void for want of the requisite number of votes. There is no pretense, however, whatever the parliamentary procedure or number of votes, that the city council made any attempt to raise the money to meet the requirements of the proposed contract, either by a specific transfer or by expressly creating a debt, in accordance with the provision of rule 7.

But after the passage of the annual appropriation bill, the preceding March, no other way was open by which the money could be provided; yet, the passage of the order, authorizing a contract on the part of the city wherein it incurred a liability for the payment of $38,537, by implication created a debt, which the city government had no right to incur except in one of the ways above described. The payment of money upon such a debt would therefore be "for a purpose not authorized by law," and bring this phase of the case within the purview of R. S., chap. 79, sec. 6, item XI.

That is, suppose the order had provided for the purchase of the spans, and expressly authorized payment therefor, from the city treasury, it would then have been a manifest violation of said section 7, and, being entire, would have been void. Instead of an order for

express payment, the city government passed an order for implied payment, from the city treasury, as if the order had expressly provided for it. But this order passed in violation of said rule was void, and placed the city government in the position of voting to pledge the credit of the city "for a purpose not authorized by law."

While the decision of this case might rest upon the above conclusion, and further consideration thereof be omitted, yet, it is obvious that the real issue in the case is based upon the second ground upon which the plaintiffs claim an injunction, namely, that the city has no constitutional right to enter into the contract contemplated by the order.

We therefore think it just to all parties concerned that this branch of the case, which involves the substance of the contention, and not its form, should be determined.

Article 22, of the amendments to the constitution provides: "No city or town shall hereafter create any debt or liability, which singly or in the aggregate with previous debts or liabilities, shall exceed five per centum of the last regular valuation of said city or town; provided, however, that the adoption of this article shall not be construed as applying . . . . to temporary loans to be paid out of money raised by taxation, during the year in which they are made."

Under this provision, is raised the single question whether the liability contemplated by the above order passed by the city council of Bangor did, with the "previous debts or liabilities" of the city, exceed the five percentum limitation prescribed by the constitutional amendment. We think it did.

The valuation upon which the five percentum is to be computed is the last regular valuation of the city as made by its assessors. *Reynolds* v. *Waterville*, 92 Maine, 292. It is not in controversy that such valuation, for the purposes of this case, was $16,381,651.00. It is also conceded that the total indebtedness of the city at the time of the hearing was $771,231.20, and that there was outstanding in addition to this amount $75,000 in the form of a note, the balance of a temporary loan authorized by a vote of the city council in March 1903.

This branch of the case turns entirely upon the character of the $75,000 note. If it was a temporary loan at the time of the hearing, October 1904, there is no question but that the city debt, with the additional amount contemplated in the order for the purchase of the bridge spans, $38,537.00, would fall about $10,000 below the constitutional debt limit on the above valuation. On the other hand, if the $75,000 note had become a city liability to be added to the other city indebtedness, it clearly exceeded the limit.

In discussing this phase of the case we will assume that the loan, of which $75,000 is a part, was, in its inception, a temporary loan, within the meaning of the constitutional amendment. Then arises the question, how long can a temporary loan remain unpaid and still retain its temporary character? We think the language and punctuation employed to give expression to the constitutional amendment settles this question. After stating the prohibition, the amendment proceeds; "provided, however, that the adoption of this article shall not be construed as applying to temporary loans to be paid out of money raised by taxation, during the year in which they are made." While punctuation cannot be regarded of paramount importance in the construction of a statute or other written instrument, and should never be allowed to overturn what seems to be the plain meaning of the instrument, yet when it is so used as to enable the language to bear an interpretation which will make the whole instrument rational and self consistent, it is entitled to consideration as much as the language itself. The punctuation employed in the proviso of the above amendment is of the latter character, and impresses upon the proviso precisely the meaning, which, we believe, the legislature intended, considering the nature of the evil to be prevented.

It is apparent from the language, the punctuation and the purpose of the amendment, that the legislature intended that the proviso should exempt all loans, and parts thereof, that should be actually paid within the year in which they were made from taxes assessed and collected during the same year.

The conclusion is irresistible that the legislature, in submitting the resolve for the amendment to the people, if they had intended the construction claimed by the defendants, would have made their purpose

clear by the use of appropriate language; but failing in this, it certainly could not be reasonably assumed that they also inserted the comma after the word "taxation" in the proviso where it would manifestly oppose such purpose, rather than after the word "money", where by fair construction it might be said to favor it.

Non constat, if the legislature had punctuated as in the latter case, that a different construction than that now placed upon the proviso would follow.

The defendants contend, however, that the proviso should be construed to mean that the temporary loan may be paid at any future time provided it is paid out of taxation raised during the year in which the loan was made. But such a construction would operate to effect a complete evasion of the amendment and become subversive of its very purpose.

For instance, in the case at bar, the city carried over from the municipal year 1903 to the municipal year of 1904 a loan of $75,000, which was, or is, to be paid, as the defendants contend, at some future time, from the uncollected taxes of 1903. But the city treasurer said at the hearing Oct. 4, 1904, "there is as a matter of fact $30,000 or $40,000 of these 1903 taxes that are not collected yet." Assume that every dollar of this sum will be collected and applied to the payment of the $75,000 loan and yet $35,000 will remain unpaid and become a liability of the city which must be met, not from the taxes of 1903 for they are all embraced and applied in the $40,000, but from future taxation. If this was done in 1903, it could be repeated in 1904 and 1905, and so on, until the unpaid balance of the temporary loans might reach an enormous sum. Another claim is made from the testimony of the city treasurer, which is not fully in accord with the above statement in regard to the amount of taxes due, the inconsistency of which is undoubtedly due to lack of explanation, that the treasurer had collected $38,000 against this loan and expected to collect $25,000 more by the end of the year. Admit these amounts to be true, and yet we have no evidence that the amount said to have been collected has ever been applied to the loan. In fact, there is no pretense that it has. The case simply shows that it has become an asset of the city, and that, so

far as we know, may be the end of its relation to the payment of the $75,000 liability.

It would be unsafe to assume with respect to the payment of a temporary loan that any sum of money that had been collected from taxes and turned into the city treasury should be regarded as a credit upon such loan, until it was either actually paid, or specially set apart by a vote of the city council, for the special purpose of application to such payment.

In other words, when money collected from taxes is paid into the city treasury, without appropriation for any particular purpose, such money becomes an asset of the city and may be used for any legitimate expenditure.

A temporary loan, then, in contemplation of the constitutional amendment is one made for a temporary purpose to be paid during the municipal year in which it is made from taxes assessed and collected within the same year. And if such a loan although temporary in its inception, or any part thereof, is carried over, in any form, into the next municipal year, it then loses its temporary character and becomes a debt or liability of the city within the prohibition of the above amendment.

The $75,000 note, in October, 1904, had lost its character as a temporary loan, and had become a debt or liability of the city, in determining the total indebtedness, to which was to be applied the constitutional test of the right of the city to create further indebtedness. And the application of this test, as before seen, prohibits the city from making the proposed contract for the purchase of bridge spans and expending the amount of money therein, by necessary implication, appropriated.

The defendants comprising the committee of purchase further say as a defense, that they do not intend pledging the credit of the city for any amount to be paid from the Treasury until the work contracted for is completed, and until an appropriation has been made and tax assessed covering the amount of the contract. But there are two reasons why this proposition cannot prevail. First, the question is not what the committee intend to do, however good their intentions, but what they are empowered to do under the order giving them

authority to act. The law must be applied upon the assumption that they may do, what they are authorized to do; and they undoubtedly have the power to create a city liability; and second, we have already determined that a contract for the purchase of the bridge spans under the enabling order, by necessary implication does create a city liability sufficient to liquidate the payment of the purchase price specified in the contract.

The other defendants, the Mayor and the City Treasurer, file a separate answer and assert that whatever view the court may take of the questions in issue, no injunction should issue against them, because, as they say, they are not authorized in the order to make any contract, and have no intention of doing so. But the order of the city council in full, a record of which we have been considering, reads as follows:

"That the Street Engineers, one Alderman and President of the Common Council be and they are hereby authorized to contract with the lowest bidder for the two spans as advertised for the Bangor and Brewer bridge, so called, as soon as a contract shall be signed with the Public Works Company for the crossing of their street cars over said bridge at an annual rental of $1500 per year. The Mayor and City Treasurer for and in behalf of the City of Bangor are hereby authorized to execute a contract with the Public Works Company for said annual rental."

By this, it will be observed that a contract with the Public Works Company for the passage of their street cars over said bridge, to be executed on behalf of the city by the Mayor and City Treasurer, was a condition precedent to the execution of the contract for the purchase of the bridge spans. If the Mayor and the City Treasurer should proceed under the authority given them, and, for a valid consideration make a contract with the Public Works Company for the passage of their cars over the proposed bridge, it might raise complications of irreparable detriment to the city. Both the authority to purchase the spans and to make the contract with the Public Works Company are embraced in the same order and become a part of the same transaction. It seems proper therefore, inasmuch as the proposed contract for the purchase of the bridge spans is held to be ultra vires, and the committee enjoined from making it, that the Mayor and

City Treasurer should also be restrained from consummating any contract or paying out any money by virtue of the order in question.

> *Bill sustained against all the respondents named therein without costs, and against whom perpetual injunction is to issue.*
>
> *Decree in accordance with this opinion.*