EDWARD B. BLAISDELL *vs.* INHABITANTS OF THE TOWN OF YORK.

York.    Opinion July 1, 1913.

*Assumpsit.    Breach.    Contract.    County    Commissioners.    Declaration
Demand.    Jurisdiction.    Laying    Out    of    Way.    Notice.    Pecuniary
Interest.    Petition.    Record.    Supplemental Contract.    Town.
Meetings.    Void.    Voidable.    Votes.    Warrant.*

1. If the court in which the proceedings took place had jurisdiction to render the judgment which it did, no error in its proceedings which did not affect the jurisdiction will render the proceedings void, nor can such error be considered when the judgment is brought collaterally into question.
2. The board of County Commissioners was the tribunal designated by statute to have jurisdiction over laying out of the way in question and was the only tribunal having such jurisdiction.
3. The pecuniary interest of one of the board, although of trifling value, was disqualifying so far as he was concerned, but such pecuniary interest on the part of one member did not oust the board of jurisdiction, nor render its subsequent proceedings void.
4. It rendered them merely voidable, subject to being set aside upon proper process, therefor. This rule of law is firmly established by the authorities.
5. When a member of an inferior tribunal is interested at common law, the only remedy is to set proceedings aside, upon proper process. They cannot be attacked collaterally.
6. In calling town meetings, the person to whom the warrant is directed must post an attested copy of the warrant in some public and conspicuous place in said town, unless the town has appointed by vote in legal meeting a different mode, but the statute does not require that the return shall recite the words "public and conspicuous" but it does require that the copies shall in fact be posted in a public and conspicuous place, and the return of the officer is the only competent evidence upon the question.
7. If the return recites the places of posting and those places of posting are of such a character that as a matter of common knowledge they are public and conspicuous places, that is sufficient. It is for the court to say whether the statute has been complied with.

On report.    Judgment for plaintiff for $44,536.99, with interest from May 15, 1913.

This is an action of assumpsit to recover the sum of $51,066.71, claimed to be due plaintiff from the defendant town for the construction of a way and bridge across York River. The declaration contains a count for breach of contract, an account annexed for labor performed, and materials furnished and the common counts. The defendant pleaded the general issue and filed a brief statement alleging, among other things, that the written contract between the plaintiff and defendant for the construction of said way and bridge was invalid, and that the County Commissioners of York County had no jurisdiction to lay out said way, etc.

At the conclusion of the testimony, by agreement of the parties, the case was reported to the Law Court for its determination upon so much of the evidence as is relevant and legally admissible.

The case is stated in the opinion.

*Cleaves, Waterhouse & Emery, Frank D. Marshall, and John C. Stewart,* for plaintiff.

*James O. Bradbury, and E. P. Spinney,* for defendants.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, JJ.

CORNISH, J. This is an action of assumpsit brought by the plaintiff to recover the sum of $51,066.71, the amount alleged to be due him under two contracts made with the defendant town for the construction of a way and bridge across York River. The declaration contains one count for breach of contract, another on an account annexed for labor performed and materials furnished, and also the common counts.

This is one, and well-nigh the final chapter in a varied and prolonged litigation arising from the laying out and construction of the York Bridge, so called, connecting the towns of York and Kittery.

The history of the case is this:

The first step towards the laying out and construction of this way and bridge was taken when the selectmen of York, two of whom continued to act in that capacity during all the subsequent controversy, petitioned the Legislature for the passage of a special act authorizing the construction of a highway and bridge across York River. Such an act was necessary because the proposed way

and bridge would cross tide waters. *Cape Elizabeth* v. *Co. Commrs.*, 64 Maine, 456; *Chapin* v. *Maine Central R. R. Co.*, 97 Maine, 151; *Chase* v. *Cochrane*, 102 Maine, 431. This authority was conferred by Chap. 50 of the Priv. and Special Laws of 1905, which was approved and took effect February 17, 1905.

On April 4, 1905, Seabury Wells Allen and one hundred and sixty-nine other residents and taxpayers of the defendant town petitioned the County Commissioners of York County to lay out the way in question, as one required by common convenience and necessity. This petition was entered at the April session, 1905, hearing was had on May 18, 1905, the petition was granted and the way laid out. The matter was then continued to the January session, 1906, when the report was recorded and the proceedings closed. From this action of the County Commissioners no appeal was taken.

At the annual meeting held in March, 1906, an article was inserted in the warrant to see if the town would appropriate a sufficient sum of money for the construction of the bridge and highway as laid out by the County Commissioners. This article was indefinitely postponed.

A special town meeting was held on October 13, 1906, "to see if the town will vote to build the bridge and approaches as laid out by the County Commissioners across York River at York Harbor." This is the crucial meeting in this case, because the plaintiff bases his rights upon the action then taken.

Upon a written ballot being taken the whole number of ballots cast was 297, of which 174 were in favor of building and 123 were opposed.

"On motion of Mr. Gifford, a committee of four was chosen to act in conjunction with the selectmen in building the bridge, said committee, as suggested by Mr. Gifford, to consist of Charles H. Young, Joseph W. Simpson, Charles E. Weare and J. Perley Putnam, said committee to serve without pay."

As the record was first made, it was "voted to accept the bid of E. B. Blaisdell for $30,000." By order of court, upon mandamus proceedings subsequently brought, the record was changed by inserting the word "not" after "voted," so that it now stands, "Voted not to accept the bid of E. B. Blaisdell for $30,000."

On the same day, October 13, 1906, the three members of the board of selectmen, and the four persons above named appointed to act in conjunction with them, met and chose Charles H. Young permanent chairman, the selectmen not voting. On October 17, 1906, the seven members met again by adjournment and chose Mr. Bragdon, who was chairman of the selectmen, secretary of the committee, but he declined to serve. A discussion followed as to the duties and powers of the three selectmen and of the four associates, the former claiming that in fact the selectmen and the associates constituted two committees, one composed of three and the other of four members, while the associates contended that one committee of seven had been appointed by the town. It was finally agreed that each faction should consult counsel. This was done, and on October 22, 1906, another meeting was held at which, after discovering that each faction had obtained legal advice substantiating its previous claim, the selectmen informed the other members that they would no longer act with them, and withdrew. At this meeting, J. Perley Putnam was chosen permanent secretary, the selectmen taking no part. From that time on, the selectmen attended no other meetings of the committee, although they were duly notified of each meeting.

For convenience, we will designate hereafter the selectmen by that name, and the remaining four as the committee, it being understood that in each instance all the members were present and their votes were unanimous.

On October 25, 1906, the committee met and voted to employ R. W. Libby as engineer, but he declined to serve; and on October 30, 1906, they voted, "to engage A. W. Gowen to take levels, change plans and take charge of the construction of the bridge." It was also "voted to adopt the plans with some changes that were offered for inspection at the special town meeting of October 13, 1906."

On November 5, 1906, it was voted to prepare proposals for bids to be in the hands of the secretary not later than November 14, 1906.

On November 16, 1906, "an injunction was read which had been served upon Mr. Young, restraining the committee from awarding the contract for the bridge."

On November 30, 1906, Mr. Young "reported from Joseph P. Bragdon that no further action would be taken in relation to the injunction now pending in court;" and at the same meeting the bids were opened and the contract was awarded to E. B. Blaisdell, the plaintiff, he being the lowest bidder, for the sum of $39,500.

On December 5, 1906, a written contract which forms the basis of this action was entered into between the plaintiff and the town of York, the same being signed in behalf of the town by the four members of the committee only.

At various times subsequent to this, the selectmen sent communications both to the contractor and to the committee, protesting against the carrying out of the contract, denying its validity and all liability on the part of the town in connection therewith.

The Legislature of 1907 passed a Private and Special act, Chap. 101 which took effect February 21, 1907, and was in these terms:

"The vote of the inhabitants of the town of York, passed in town meeting October 13, 1906, appointing a committee of four to act in conjunction with the selectmen of said town in building a bridge across York River as laid out and ordered by the County Commissioners of the county of York, and the action of said committee in behalf of said town in petitioning the secretary of war and the chief of engineers that the location and plans of said bridge be approved, and that the said town be authorized to commence the construction thereof and maintain the same as provided by law, are hereby authorized and ratified."

At the next annual town meeting held in March, 1907, various articles were submitted to the voters, viz.:

"To see what action the town will take for the construction and maintenance of the proposed bridge and approaches across York River which the County Commissioners have ordered to be built," etc.:

"To see what action the town will take for the payment of all contracts and bills to be legally entered into for the proposed construction and maintenance of the proposed bridge," etc.:

"To see if the town will authorize its board of selectmen to obtain proper surveys, drawings, contracts and specifications relating to the proposed construction of bridge and approaches across York

River and to enter into such contracts therefor as said board shall consider wise," etc.

All these articles were indefinitely postponed.

Another article read: "To see what action the town will take relative to the committee of four appointed at a town meeting held October 13, 1906, in connection with the proposed construction of said bridge." Upon this, it was voted, "that the committee be dismissed from further service."

The contractor began work regardless of the protests, and from time to time as the work progressed the committee drew orders in favor of the contractor upon the town treasurer, in accordance with the certificate of the engineer in charge, and payment of each was demanded. No single one of them was honored after April 1, 1907.

In September, 1907, the War Department required certain changes in the work, causing additional expense; and on October 17, 1907, a supplemental contract to cover these changes was entered into between the plaintiff and the committee, the agreed price being $9,118.65, with a deduction from the former contract price of $2,128.22, making a net increase of $6,990.43.

January 29, 1908, the engineer notified the entire committee of seven that the bridge and way were so far completed that the plaintiff was entitled to the balance of eighty per cent under the contract. The committee accepted the work, and notified the selectmen who replied on March 18, 1908, declining to recognize any authority on the part of the committee to act for the town in any matter relating to the bridge.

May 16, 1908, the committee notified the selectmen that the work was completed at a total expense of $49,765.63, for which amount they had drawn orders upon the town treasurer.

At the annual town meeting held in March, 1910, an article to see if the town would vote to pay for the bridge and way was indefinitely postponed.

At the annual town meeting held in March, 1911, and at a special meeting held on June 10, 1911, similar articles met a similar fate.

The present situation therefore is, that the bridge has been completed, but has not been accepted by the town; and although since

completion it has been used by the traveling public to some extent, the selectmen have erected signs indicating that it is a private way, and disclaiming all liability in connection with its maintenance or use. The contractor has not received his pay, and this action is brought to determine his rights.

What are the legal rights of the parties? The plaintiff's claim is assaulted from many angles. Is any one of these assaults fatal?

1. VALIDITY OF PETITION TO COUNTY COMMISSIONERS.

The defendants contend in limine that the original petition of April 4, 1905, did not describe with sufficient definiteness the termini of the proposed way, and therefore conferred no jurisdiction upon the County Commissioners, with the result that all their subsequent proceedings thereunder were null and void.

The rule of law is firmly established in this State that the "petition describing a way," under R. S. Chap. 23, Sec. 1, must describe it with reasonable definiteness, in order to give the County Commissioners jurisdiction. The chief reason for this requirement is to give all parties, over whose land the proposed way is to be laid, and all others whose interests may be affected thereby, such information, through the public notice on the petition, as will enable them to be present and be heard. Keeping this object in view, it is apparent that the description should not, on the one hand be vague and indefinite, nor on the other need it be expressed with extreme technical precision. It must set forth "with reasonable certainty," "with reasonable and approximate definiteness," the termini and the route. Cases applying this rule with greater or less liberality, and therefore cited by the one side or the other, are numerous and familiar.

But the defendants contend that this particular petition has already been held insufficient by this court in Bliss v. Junkins, 106 Maine, 128, and that the question is therefore res judicata. In that case, the owner of land over which this way was laid out brought a bill in equity against the County Commissioners, the selectmen, the conjoined committee of four and the contractor, asking that they be enjoined from entering upon or attempting to take, under these proceedings of the County Commissioners, any portion of the complainant's lot, or from erecting or maintaining any structures on or adjacent to the same. The bill alleged, as grounds for relief, want

of jurisdiction in the County Commissioners, because of defective petition and a disqualifying interest in one member of that board, Mr. Junkins. The defendants demurred generally to the bill. No evidence was therefore introduced, and upon the face of the petition alone the description was held not to make the termini reasonably definite, and therefore the demurrer was overruled. The description under consideration then and now is as follows: "A county way between some point in York Harbor on the county way leading from York Village through York Harbor to Norwood Farm, to another point *southwesterly* over tide water to the county way leading from Sewall's Bridge to Seabury R. R. Station to Kittery Point.  .  .  .  Said way to pass over Harris Island and Bragdon's Island in York River."

It may well be that the words of the petition, which alone were before the court of the former case, might seem too vague and indefinite. But when applied to the geographical situation and to the location on the face of the earth, as brought out in the evidence, we think the termini are set out with such reasonable certainty as to meet the fair intent and requirement of the statute. It is true that the distance on the county road between York Village and Norwood Farm, which marks the easterly base line, some point on which the new road was to make its eastern terminus, is more than a mile; and the distance on the county road from Seabury Station to Kittery Point, some point on which the new road was to make its western terminus, is four or five miles, the York River lying between; and were there nothing in the petition, when applied to the locus, to limit these termini, its inadequateness and invalidity must be conceded.

But the location of Harris and Bragdon's Islands in York River, with reference both to each other and to the bank on either side, taken in connection with the general "southwesterly" course which the way and bridge were to run, bring the termini within reasonable and fairly definite limits. It matters not how far it may be from York Village to Norwood Farm, nor from Seabury Station to Kittery Point. There is only a short portion of that distance on either side of the river that can be utilized if the way is to cross the two islands in a southwesterly direction. The islands serve as piers on which the bridge and the way are to rest, and from which

they cannot greatly swerve. That is definite which can be rendered definite. Any owner of land over which the way was to pass, and any other person whose interests could be affected by the location, must have been fully appraised of the proposed route, the test which must not be lost sight of in applying the legal rule. An equally liberal construction has been adopted by this court in other cases. *Windham* v. *Co. Commrs.*, 26 Maine, 406; *Sumner* v. *Co. Commrs.*, 37 Maine, 112; *Raymond* v. *Co. Commrs.*, 63 Maine, 112; *Packard* v. *Co. Commrs.*, 80 Maine, 43; *Andrews* v. *Co. Commrs.*, 86 Maine, 185.

We hold, therefore, upon the full evidence that the description in the petition was reasonably definite as to both termini and course, and that the County Commissioners were thereby given jurisdiction of the case.

2.   DISQUALIFICATION OF ONE COMMISSIONER.

The defendants attack the jurisdiction of the County Commissioners on another ground. It appears in evidence that Samuel W. Junkins, one of the three members of the board to whom the petition was addressed, was, during the whole period covered by the proceedings, the owner of one-fourth undivided interest in Bragdon's Island, one of the small islands over which the way was located.

The defendants contend that by reason of this interest in one member, the board had no jurisdiction over the subject matter, their action was void ab initio, and therefore the judgment rendered by them was open to collateral attack in this action. This is not our view of the law.

It may be granted that the pecuniary interest of Mr. Junkins, although apparently of trifling value, was nevertheless disqualifying so far as he was concerned. *State* v. *Delesdernier,* 11 Maine, 473; Conant's Appeal, 102 Maine, 477; *Pierce* v. *Bangor,* 105 Maine, 412. The law is jealous of the absolute disinterestedness of its judicial tribunals and wisely so. But did the existence of this interest oust the board of entire jurisdiction in the subject matter and render all its proceedings utterly void, or did jurisdiction vest and the proceedings become merely voidable? That is the precise question to be determined.

The general rule of law as to validity of judgments is stated by the Supreme Court of the United States as follows: "If the court in which the proceedings took place had jurisdiction to render the judgment which it did, no error in its proceedings which did not affect the jurisdiction will render the proceedings void, nor can such error be considered when the judgment is brought collaterally into question." *McGoon* v. *Scales,* 9 Wall, 23.

It must be conceded that the board of County Commissioners was the tribunal designated by statute to have jurisdiction over the laying out of the way in question, and was the only tribunal having such jurisdiction. The petition itself was in proper form, as we have already determined; and the jurisdiction was thereby conferred upon the board, leaving out for the moment the question of pecuniary interest. Under these conditions, and in the absence of any prohibitive statute, such pecuniary interest on the part of one member did not oust the board of jurisdiction, nor render its subsequent proceedings void. It rendered them merely voidable; that is, subject to being set aside upon proper process therefor; and this rule of law is firmly established by the authorities.

The leading English case, and one that is frequently cited by the courts in this country as well, is *Dimes* v. *Grand Junc. Canal,* 3 H. L. C., 759, decided in 1852. In that case, the Chancellor who was interested in the defendant company to the extent of several thousand pounds affirmed a decree made by the vice-chancellor, and the question whether this decree was void or voidable was very carefully and exhaustively considered by the fifteen judges who answered through Parke, B., that it was voidable and not void, that unless it was attacked directly either by writ of prohibition in some instances, or by writ of error in others, the action of the court in which the interested judge had taken part was valid, and the persons acting under its authority could not be treated as trespassers. The court added: "The many cases in which the court of King's Bench has interfered when interested parties have acted as magistrates and quashed the orders of the court of which they formed a part, after they had been removed by certiorari afford an analogy. None of these orders is absolutely void; it would create great confusion and inconvenience if they were."

The doctrine of that case stands as the rule at common law, and has been reaffirmed in many jurisdictions.

A leading case in this country, where the whole subject is elaborately discussed, is *Moses* v. *Julian,* 45 N. H., 52, 84 Amer. Dec., 114, and full note p. 126. There the rule is stated to be that "at common law the recusation of a judge does not affect the jurisdiction, but is merely ground to set aside the judgment on error or appeal, except in cases of inferior tribunals, where no writ of error or appeal lies."

"Where a member of an inferior tribunal is interested at common law, the only remedy is to set the proceeding aside." *Foot* v. *Stiles,* 57 N. Y., 399, 408.

Further citation of authorities is unnecessary.

The fact that the judicial disqualification may be waived by the parties necessarily concedes jurisdiction because consent can never give jurisdiction where none existed before. And yet the courts hold with unanimity, so far as we have been able to discover, that such disqualification, in the absence of any express statute to the contrary may be waived. *Moses* v. *Julian,* 45 N. H., 52; *Stearns* v. *Wright,* 51 N. H., 600; and cases cited in 84 Amer. Dec. supra, pp. 130-131. See also *Danvers* v. *Co. Commrs.,* 2 Met. 185; *Tolland* v. *Co. Commrs.,* 13 Gray 12; *Stevens* v. *Co. Commrs.,* 97 Maine, 121-127.

The legal effect of judicial disqualification and of waiver is laid down by the Wisconsin Supreme Court in these words: "At common law, it was recognized that a judge who was interested in the action or of kin to either party was disqualified from sitting in any case. Notwithstanding this rule, his judgment in the cause was generally considered erroneous only and not void, and the objection might be waived by the parties either expressly or impliedly by proceeding without objection to the trial, knowing the facts." *Case* v. *Hoffman,* 100 Wis., 314. To the same effect is Freeman on Judgments, Secs. 144-145.

Another principle equally well-settled is that when a statute provides that in a certain case or under certain specified conditions a judge shall not sit or shall not act, any judgment rendered by such judge in such a case is coram non judice and utterly void. He is

prohibited from taking jurisdiction of the cause and it therefore follows that in such cases there could be no effective waiver, as that would be an attempt to confer jurisdiction by consent, which is impossible. 84 Amer. Dec., 126, supra, and cases. *Case* v. *Hoffman,* supra; Freeman on Judgments, supra.

These two principles of voidable judgments in the absence of statute, and void judgments when jurisdiction is expressly prohibited run through all the cases, and failure to discriminate between them has sometimes led to inacurracy of statement. More or less confusion may also have arisen from the use of the word "void" instead of "voidable." *State* v. *Richmond, 26* N. H., 232. Thus, the judgment of an interested tribunal may be void in the sense of invalid, if set aside on proper proceedings. But unless thus set aside, it stands. It therefore, strictly speaking, is not void, but voidable. It was in this sense that the judgment of the selectmen was termed void in Conant's Appeal, 102 Maine, 477, 481, because of the interest of one of the board. In that case, the question was raised directly on appeal, and the disqualifying interest was properly held to render the judgment of the board in laying out a town way invalid, and in that sense void; but not void in the broader sense of entire lack of jurisdiction, and therefore attackable collaterally. All the cases cited in that case in support of the invalidity of the judgment had raised the question directly, either by certiorari, *State* v. *Delesdernier,* 11 Maine, 473, Ex parte Hinckley, 8 Maine, 149; on appeal, *Friend* v. *Co. Commrs.,* 53 Maine, 387; *Case* v. *Hoffman,* 100 Wis., 357; or on the acceptance of the report, *Andover* v. *Co. Commrs.,* 86 Maine, 185. So in *Bliss* v. *Junkins,* 106 Maine, 128, the word void is used in the same similar sense of voidable, citing Conant's Appeal, supra, as its authority.

Keeping in mind these distinctions, the decisions are in harmony.

In Cottle, Aplt., 5 Pick., 482, *Sigourney* v. *Sibley,* 21 Pick., 101; *Gay* v. *Minot,* 3 Cush., 352; *Hall* v. *Thayer,* 105 Mass., 219, which have been called to our attention, probate proceedings were held void on appeal because the Judge of Probate was interested in the estate; and they were void and not merely voidable, because of express statutory inhibition. The court was thereby ousted of all jurisdiction.

On the other hand, in *Ipswich* v. *Co. Commrs.*, 10 Pick., 519, on a petition for certiorari, it was claimed that the proceedings were invalid because one of the commissioners was an owner of land in the town, through which town the road as altered was to pass, and was therefore not a disinterested person within the contemplation of law, there being no statutory inhibition at that time. Chief Justice Shaw, without deciding the question whether the interest was sufficient to disqualify the commissioner, held that the objection had been waived. He says: "It was well known to the town that Mr. Wildes was a freeholder there, because they had taxed him. They were parties to the proceedings, and might have objected to his sitting, if they thought fit. But they might also waive the exception if they chose, and if they were satisfied that the decision would be impartial. By consenting to proceed, with a full knowledge of the ground of exception, the exception was waived. It would be attended with great injustice were we to hold otherwise. A party might take his chance for a favorable decision, knowing of an exception which would invalidate the proceedings if unfavorable, and intending, in that event, to rely upon it. Besides, if the exception had been seasonably taken, the commissioner might have withdrawn or been replaced by one against whom no exception would lie."

It is unnecessary to discuss these legal principles at greater length. It only remains to apply them to the case at bar.

There is no statute in Maine prohibiting a county commissioner from taking part in a proceeding where the proposed way is to be located over his own land. His disqualification rests upon principles of the common law. This board of County Commissioners therefore had jurisdiction of the subject matter notwithstanding Mr. Junkins' pecuniary interest. The defendants were a party to the proceedings. They were made such by statute, R. S., Chap. 23, Sec. 2. Service must be made upon the clerk of the town as well as by posting up in three conspicuous places and by publication; and such service upon the clerk was made in this case. They were the party most in interest because upon them fell the expense of building the way. They had an opportunity to be present and seasonably object to the proceedings because of the interest of Mr. Junkins. The record does not show whether they were in fact represented or

not. It might perhaps be assumed that they knew of the interest because Mr. Junkins was a resident of the defendant town. In any event, no objection was made in their behalf at the hearing. The irregularity could also have been taken advantage of by appeal to the Supreme Judicial Court. This was not done, and the judgment of the board stands unreversed.

This case, therefore, falls under the general rule that where jurisdiction is lacking, the judgment of County Commissioners is open to collateral attack. *Small* v. *Pennell,* 31 Maine, 267; otherwise, the proceedings are binding, unless quashed on certiorari as in *State* v. *Delesdernier,* 11 Maine, 473, or set aside on appeal, as in *Conant's Appeal,* 102 Maine, 477.

It has been so held in an action of trespass. *Baker* v. *Runnells,* 12 Maine, 235; *Gay* v. *Bradstreet,* 49 Maine, 580; *Cyr* v. *Dufour,* 62 Maine, 20; *Thomas* v. *Churchill,* 84 Maine, 446; in an action of tort to recover injury to a bridge by turning the current of a stream, *Topsham* v. *Brunswick,* 65 Maine, 445; and in a bill in equity praying for an injunction, *White* v. *Co. Commrs.,* 70 Maine, 317. The same rule should and does apply in an action of assumpsit, like this, to recover the cost of building the way and the bridge. In so far as *Lyon* v. *Hamor,* 73 Maine, 56, is at variance with the doctrine here laid down it is overruled.

Another principle of law might with propriety be invoked, and that is the doctrine of estoppel, jurisdiction having once attached. The special act of the Legislature authorizing the County Commissioners to lay out the way was procured upon the petition of the selectmen of the defendant town. Notice of the pendency of the subsequent proceedings before the commissioners was served upon the defendants. They either did not attend the hearing, or if they did, they raised no objection so far as the record discloses. They took no appeal to the Supreme Judicial Court from the finding of the board. The proceedings were closed and recorded in January, 1906; and on October 13, 1906, the town voted "to build the bridge and approaches as laid out by the County Commissioners." In reliance upon that vote, the plaintiff entered into the contract in question. Will the defendants now be permitted, after the contract has been completed and the bridge built, to deprive the plaintiff of

his just dues by saying that the way had not been laid out by the County Commissioners? Clearly not. They were silent when they should have spoken. They now speak too late, and their complaint falls upon deaf ears. *Martin* v. *Maine Central R. R. Co.,* 83 Maine, 100; *Stubbs* v. *F. & M. Ry. Co.,* 101 Maine, 355; *Hyde Park* v. *Wiggin,* 157 Mass., 94; *Robinson* v. *Co. Commrs.* (Maine, 1886), 4 Atl., 556.

3. LEGALITY OF THE TOWN MEETING OF OCTOBER 13, 1906.

The next point raised by the defendants is that the special town meeting of October 13, 1906, at which a vote was passed to build the bridge and appointing a committee therefor, was illegal, and its proceedings invalid, because the voters were not legally notified, as appears from the constable's return on the warrant.

The original return recites that notice of the meeting was given by posting three attested copies of the warrant, "one at the Congregational Church at Brixham, one at the Town Hall and one at the Cape Neddick Post Office in said York."

Subsequently, the constable amended his return by inserting the allegation of public places, so as to read, "by posting three attested copies of the within warrant *in three public places* in said town, to wit: One at the Congregational Church," etc.

But the defendants say that this attempted amendment is invalid, because it was not on oath as the statute requires. R. S., Chap. 4, Sec. 10. This point is well taken, because the amendment is not under oath, nor does the word "conspicuous" appear even in the amendment; and were it necessary, the report could be discharged in order that further amendment be made and these technicalities complied with. *Bresnahan* v. *Soap Co.,* 108 Maine, 124. But we think the original return was in itself sufficient, and required no amendment.

R. S. Chap. 4, Sec. 7, specifies that an attested copy of the warrant shall be posted by the person to whom it is directed "in some public and conspicuous place in said town seven days before the meeting, unless the town has appointed by vote, in legal meeting, a different mode, which any town may do. In either case, the person who notifies the meeting shall make return on the warrant, stating the manner of notice and the time when it was given." There is no

evidence before us that the town of York has ever adopted any other than the statutory method; and with the requirements of that method, the constable more than fully complied. He posted attested copies of the warrant in three public and conspicuous places instead of in one. It is true that he did not state in his original return that the places named were "public and conspicuous," but in this case that omission did not render it fatally defective, because the court can and will take judicial notice of the fact that those places were public and conspicuous. None could be more so, a fact of such common knowledge that the court is permitted to recognize it. *McTaggart* v. *Maine Central R. R. Co.,* 100 Maine, 223, 228. The statute does not require that the return shall recite the words "public and conspicuous;" but it does require that the copies shall in fact be posted in public and conspicuous places. The question that arises then is, how can it be proved that this has been done?

It cannot be by evidence aliunde. The return of the officer is the only competent evidence upon the question. *Auburn* v. *Water Power Co.,* 90 Maine, 71, 78. But if that return recites the places of posting, and those places are of such a character that as a matter of common knowledge they are public and conspicuous, that is sufficient. The return then shows the required fact as clearly as if it added the adjectives. In such a case, the adjectives are superfluous.

It is for the court to say whether the statute has been complied with; and the judgment of the officer is not controlling. It has often been held that a return which recites that the copies have been posted in a "public" place, or in a "public and conspicuous place," without specifying the places themselves, was defective. *State* v. *Williams,* 25 Maine, 561 ; *Fossett* v. *Bearce,* 29 Maine, 523 ; *Bearce* v. *Fossett,* 34 Maine, 575 ; *Allen* v. *Archer,* 49 Maine, 346. The irresistible logic of these cases is that the characterization by the officer is not conclusive and that it is still for the court to determine whether the places selected are of the required kind; and it can determine that fact only when the precise places are specified.

Suppose for instance a return recited that a copy had been posted on a "pine tree in the midst of a large forest, being a public and conspicuous place in the town," would the court accept that as a compliance with the statute, even though the adjectives were used?

On the other hand, a recital that it had been posted at the Post Office, or the Church, or the Town House, should be sufficient, without the adjective. The essential thing is the fact, and not the adjectives.

It must be admitted that dicta may be found to the effect that the return should both specify the places and state that they are public and conspicuous, as in *State* v. *Williams,* 25 Maine, 561, 566, and in *Brown* v. *Witham,* 51 Maine, 29; but in the former case the place was not specified, and in the latter it did not appear that the places named were situated within the town, so that in each the decision rested upon other points, and was not in conflict with what we conceive to be the true rule.

In all the other cases called to our attention, the return was clearly defective. *Christ's Church* v. *Woodward,* 26 Maine, 172; *Hamilton* v. *Phippsburg,* 55 Maine, 193; *Bessey* v. *Unity,* 65 Maine, 342.

We have been unable to find any decision in this State directly in point; but in *Scammon* v. *Scammon,* 28 N. H., 419, we have a well considered authority. In that case, the statute required the posting of a town warrant in a public place. The return recited that a copy had been posted at the Baptist meeting house, but failed to add that it was a public place. The same point was raised there as here; but the court held that a meeting house is prima facie a public place, and the omission to so describe it in the return was immaterial.

We have no hesitation in holding therefore that the return in the case at bar was valid, the copy of the warrant legally posted, and the meeting of October 13, 1906, legally called.

It might be added that by Chap. 101 of the Priv. and Spec. Laws of 1907, the action of the town at that meeting was "authorized and ratified;" but it is unnecessary to discuss the legal effect of that act.

4.  THE BRIDGE COMMITTEE.

As has already been stated, at the special meeting of October 13, 1906, it was voted to build the bridge as laid out by the County Commissioners; and "a committee of four was chosen to act in conjunction with the selectmen."

What were the powers and duties of the selectmen and of this committee of four under this vote? Were two committees thereby created, one composed of the three selectmen and the other of the

four men named, as claimed by the defendants; or was there one committee of seven, as claimed by the plaintiff? The validity of the subsequent contract depends upon the answer to these questions.

What was the situation?

The Legislature of 1905, upon a petition signed by the selectmen, two of whom were still members of the board, had authorized the laying out of this way over tide waters. The County Commissioners, acting upon a petition signed by a large number of the taxpayers of York, had decided that public convenience and necessity required the laying out of the way and had laid it out, and had allowed the town of York two years in which to open it and make it safe and convenient. From this adjudication no appeal was taken.

It then became the duty of the town to construct the way and bridge; and if it neglected or refused so to do within the allotted time, the County Commissioners could have appointed an agent to perform that duty, at the expense of the town. R. S., Chap. 23, Sec. 39; *Keyes* v. *Westford,* 17 Pick., 273.

At the March meeting, 1906, the town had indefinitely postponed an article concerning the raising of money for the construction of the bridge; but the duty to construct it remained upon the town no less heavily. Independent of a special vote, however, the selectmen had no power to proceed in the matter. *Smith* v. *Cheshire,* 13 Gray, 318; *Bean* v. *Hyde Park,* 143 Mass., 295; *Goff* v. *Rehoboth,* 12 Met. 26; *Chase* v. *Cochrane,* 102 Maine, 431-7. As selectmen, they had no more authority in the premises than the school committee.

At the special meeting of October 13, however, the town by a "written ballot" voted to build the bridge and appointed its agents to have charge of the work, namely, the selectmen and the committee of four acting in conjunction with them. The selectmen received their power and authority by precisely the same vote and in precisely the same manner as the other four gentlemen named. The entire committee of seven was created at one and the same time. The names of the three selectmen were not recited in full, because it was unnecessary. The names of the other four were specified because it was necessary. But the vote had the same effect as if the seven

men had been specifically named. The members of the board of selectmen, as such, had no more and no less power than the members of the committee of four. ·Had the selectmen been appointed to act in conjunction with the committee of four, the effect would have been the same. It was not the creation of two boards, which must act concurrently or not at all, like the two branches of a city government or of the Legislature, but of one board, all the members of which were equal. "In conjunction with" meant "in association with," "combined with," "united with." Such is the ordinary sig-' nification of the term. Such is its definition by lexicographers, "Conjunction," Webster's Dic.; Standard Dic. Such is its legal interpretation; *Hume* v. *U. S.,* 118 Fed., 689. They were all together created a single committee, which has been defined to be "a person or persons to whose consideration or determination certain business is referred or confided." *Farrar* v. *Eastman,* 5 Maine, 345.

5.   THE CONTRACT OF DECEMBER 5, 1906.

The duty of the bridge committee thus chosen is obvious. They were to take the necessary steps to carry out the vote of the town and obey instructions by building the way and the bridge. It was their duty to select an engineer, obtain plans and specifications, advertise for bids, make the award and execute a contract.

This the four members of the committee set about doing at once. But the selectmen, upon discovering that their idea of two concurrent committees was not accepted, refused to take any part whatever in the proceedings. They were notified of every meeting, but they attended only the first two and declined to act in those. Under these circumstances, there was nothing left for the majority of the committee to do except to proceed without the assistance of the minority. This they did, and after taking the necessary preliminary steps as set forth in the history of this case, they entered into a contract with the plaintiff, as the lowest bidder, on December 5, 1906, for the construction of the way and bridge for the sum of $39,500. This was a legal and binding contract, entered into on the part of the town by a majority of a duly constituted committee.

It is true that the town made no appropriation to meet the cost at the meeting when the committee was appointed; but that in no way affected the validity of the appointment or of the contract made

by the committee thus chosen. Liability on the part of the town was created when the contract was signed. *Westbrook* v. *Deering,* 63 Maine, 231. And if the contractor saw fit to proceed with the work and rely upon future appropriations or upon collecting his debt by other means, he had a legal right so to do. It does not lie in the mouth of the town to say we repudiate the contract because we made no appropriation with which to meet its requirements.

No valid steps were taken to prevent either the making of the contract, or its performance after execution. It is true that the selectmen in November, 1906, instituted proceedings in the nature of an injunction to restrain the other members of the committee from awarding the contract; but prior to December 5, 1906, these were abandoned. They also sent various communications to the other members, the first being dated January 31, 1907, denying the authority of the four to make the contract and protesting against any work being done thereunder. But these communications were unauthorized and futile. The selectmen, as such, had no powers in the matter. The only powers they possessed were as members of the bridge committee, and as such they had been appointed to construct the bridge, not to block its construction. Under date of July 26, 1907, they wrote a similar letter to the plaintiff, disclaiming both as selectmen and in behalf of the town any liability under the contract, protesting against his proceeding further, and notifying him that he was incurring expense at his peril. This was equally futile, because their attempting to act in behalf of the town was a mere assumption. There was no vote of the town authorizing them to rescind the contract, nor to prevent its execution.

If the town had voted not to carry out the contract, the plaintiff would then have had a right to sue for the breach. But this the town never did. It took no action after the special meeting of October 13, 1906, until the annual meeting in March, 1907, the effect of which we will now consider.

6.  THE TOWN MEETING OF MARCH 11, 1907.

Two subjects were taken up. In the first place, various articles were considered, all looking to the obtaining of plans and specifications, the making of a new contract, and the appropriation of money for building the bridge; and they were all indefinitely postponed.

But these had to do with the future, not with the past. The existing contract was ignored, or perhaps it might be inferred that by the refusal to consider the making of a new one, the old one was recognized as binding and satisfactory. In any event, no new contract was authorized, and no vote was passed touching the one already made. The plaintiff's rights, thereunder, remained unchanged.

In the second place, the town voted that the committee of four appointed to act in conjunction with the selectmen "be dismised from further service."

The right of the town to do this cannot be questioned. The authority given to these men was a naked authority, and revocable, *George* v. *School Dist.,* 6 Met., 497; but not of course to the injury of the rights of third parties that had already intervened, *Getchell* v. *Wells,* 55 Maine, 433.

What was the effect of this vote?

It reduced the bridge committee from seven to three. The selectmen were not dismissed. They continued to possess the powers conferred upon them at the special meeting in building the bridge. The powers of the other four ceased. But this in no way affected the contract already made. That stood in full force and virtue. The fact that the selectmen still maintained their attitude of nonparticipation in carrying it out was of no consequence. The work continued without their supervision, but under the eye of the engineer who was legally employed, was never discharged, who issued his certification from time to time, and finally accepted the work.

The committee of four disregarded the vote of dismissal and continued to act; but all acts on their part after March 11, 1907, were unauthorized and void.

Such we believed to be the legal effect of the annual meeting of 1907.

Nor was the situation changed by the vote at the annual meetings in March, 1910, and March, 1911, and the special meeting of June 10, 1911, indefinitely postponing articles authorizing payment for the bridge and way or the settlement of the claim of the contractor. The work had then been long since completed, and the refusal to pay a debt can in no way lessen the obligation.

7.    SUPPLEMENTAL CONTRACT OF OCTOBER 17, 1907.

It follows from what we have already held that this supplemental contract was unauthorized and void. It was entered into in behalf of the town by the four members of the committee several months after they had been dismissed from further service. The subject matter of the contract was certain modifications and additions required by the War Department and the town was obliged to make them; but it was not obliged to contract with the plaintiff therefor. The work has been done by the plaintiff, acceptably to the engineer, and it is a hardship that he must bear the loss. But he was bound to ascertain and take notice of the power of the committee to bind the town. *Turney* v. *Bridgeport,* 55 Conn., 412; *Lowell Sav. Bank* v. *Winchester,* 8 Allen, 109; *Boston Elec. Co.* v. *Cambridge,* 163 Mass., 64; and if the persons assuming to act did so without authority, he cannot recover. *Clark* v. *Russell,* 116 Mass., 455; *Bean* v. *Hyde Park,* 143 Mass., 245; *Blanchard* v. *Ayer,* 148 Mass., 174; *Tufts* v. *Lexington,* 72 Maine, 516. Even the use of the bridge by the town would not necessarily bind it to pay for unauthorized work upon it, although the same was beneficial. *Hayward* v. *School Dist.,* 2 Cush., 419; *Stuart* v. *Cambridge,* 125 Mass., 107; *Boston Elec. Co.* v. *Cambridge,* supra.

8. DAMAGES.

The conclusion reached is that the defendants are liable under the original contract of December 5, 1906; but not under that of October 17, 1907. What then is the amount of damages?

The original contract price was $39,500; but when the supplemental contract was made, the plaintiff was relieved from performing certain work under the original contract, the cost of which was agreed to be $2,128.22, so that the contract price of the work actually performed under the first contract was $37,371.78. From this should be deducted the sum of $3,947.71, the amount received by the plaintiff from John C. Stewart while town treasurer. This leaves a balance of $33,427.07. But the contract provided that the plaintiff should receive his pay monthly, on the 15th of each month "for all work done and materials furnished and delivered on the work up to and including the last day of the preceeding month, certified to by the committee's engineer to be in accordance with this contract; less twenty per cent of such amount, which percentage

shall be withheld by the committee until the final completion and acceptance of the work, under the terms and agreements of this contract, when the percentage so retained together with the balance due, shall be paid by the committee upon the certificate of the committee's engineer that the whole work provided for in this contract is completed and acceptably finished within the time specified." These monthly statements were duly furnished, and the contractor thereupon made demand upon the full committee for payment and the majority of the committee gave the plaintiff an order on the town treasurer, Edward E. Mitchell, for the amounts so certified. None of these orders was honored by the treasurer or paid after April 1, 1907. Being signed only by those members of the committee who had been dismissed on March 11, 1907, the treasurer was doubtless justified in his course. But the dismissal of those four members did not relieve the town from paying the installments when due in accordance with the terms of the contract. The plaintiff should not be deprived of his money because the town had interfered with the machinery of payment, or had failed to make an appropriation.

The payments were due at certain specified times, demand was duly made, and the payments not having been made when due, the plaintiff is entitled to interest for the default.

Computing, therefore, the interest on the various sums due under the first contract, from their due dates to May 15, 1913, disregarding entirely the amount of the second contract, gives $11,109.92; and adding this to the balance found due on the principal, $33,427.07, makes a total of $44,536.99, due the plaintiff on May 15, 1913.

The plaintiff has also embraced in his account items aggregating $519.85, the amount claimed to have been paid by him to the engineer in charge. But we find nothing in the contract authorizing him to make any such payments and to charge the town therefor. These items are disallowed.

The entry must therefore be,

*Judgment for plaintiff for $44,536.99*
*with interest from May 15, 1913.*