Shannon **BLODGETT** et al.

v.

**SCHOOL ADMINISTRATIVE DISTRICT**
**#73 and Maine State Board**
**of Education.**

Supreme Judicial Court of Maine.

March 31, 1972.

Libhart & Ferris, by Wayne P. Libhart, Brewer, for plaintiffs.

Barry K. Mills, Blue Hill, Verrill, Dana, Philbrick, Putnam & Williamson, by Roger A. Putnam, Portland, for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEBBER, Justice.

By their amended complaint the plaintiffs, eleven taxpaying inhabitants of School Administrative District #73 (District), seek a declaratory judgment and other appropriate relief. Specifically, they pray "that the Court adjudge: (a) That School Administrative District #73 has not

been properly formed; (b) That the vote to dissolve School Administrative District #73 was not properly taken; (c) That the Court grant such other and further relief as is just in the premises." The matter comes before us on report upon the pleadings and an agreed statement of facts.

Although the statement of facts describes a number of technical irregularities in the procedures adopted by the member towns in the course of organizing the District and subsequently acting on a proposal to dissolve the District, we recite only those facts which we deem dispositive of the issues presented. The District comprises the towns of Brooklin, Brooksville, Deer Isle, Sedgwick and Stonington. Pursuant to 20 M.R.S.A., Chap. 9 the question of organization was submitted to the voters in the several towns and the results certified by the respective town clerks [1] to the State Board of Education (Board). In the case of each town the result was shown to be affirmative. On February 3, 1969 the Board certified that S.A.D. #73 was organized. From February 13, 1969 to the present time the directors of S.A.D. #73 have managed and controlled the public schools in said district. On April 24, 1970 the voters of the Town of Brooksville initiated a petition for dissolution of the District. On receipt of the petition the Board took the requisite actions pursuant to 20 M.R.S.A., Sec. 222 to prepare a dissolution agreement and submit the issue of dissolution to action by the voters in the several towns. The results of the voting as certified by the several town clerks indicated that a majority of the voters in the member towns had voted against dissolution. Certain ballots having been disputed, the Board conducted a hearing, made a determination with respect to each challenged ballot and found that,

although the numerical margin was slightly decreased, the negative vote continued to prevail. No challenge is here made to the Board's resolution of the ballot issue. The Legislature subsequently enacted P. & S.L. 1971, Ch. 93, effective September 23, 1971, the pertinent provisions of which are as follows:

"Sec. 10. School Administrative District No. 73 reconstituted and established; validation of proceedings in member municipalities. The municipalities of Brooklin, Brooksville, Deer Isle, Sedgwick and Stonington are constituted to be and to have been since February 13, 1969, a School Administrative District, known as School Administrative District No. 73, with all of the powers, privileges and franchises granted to School Administrative Districts according to the Revised Statutes of 1964, Title 20, sections 211 to 307. The proceedings taken in the town meetings held in the municipalities of Brooklin, Brooksville, Deer Isle, Sedgwick and Stonington, wherein it was voted to join in the formation of a School Administrative District, are validated, confirmed and made effective.

"Sec. 11. Validation of election and proceedings of school directors and action by officers and agents. The school directors of School Administrative District No. 73, selected in the said municipalities to serve as such, are declared to be and to have been duly elected and qualified for the respective terms for which each was elected, and all of the proceedings of the board of school directors of said district as said board was from time to time constituted and as shown by the records of said district and all of the action duly taken in accordance therewith by the officers and agents of said district

---

1. 20 M.R.S.A., Sec. 216 provides: "When the residents of each of the municipalities have voted upon the formation of the proposed School Administrative District and all of the other questions submitted therewith, the clerks of each of the municipalities shall make a return to the board in such form as the board

shall determine. * * * The board shall * * * issue a certificate of organization * * *. * * * The issuance of such certificate by the board shall be conclusive evidence of the lawful organization of the School Administrative District. * * *."

with regard to the issuance of capital outlay bonds or any borrowing in anticipation of the sale thereof, or the preparation, presentation and acceptance of any school budget or any borrowing for current operating expenses, are validated, confirmed and made effective.

"Sec. 12. Amendments. Any amendments of, additions to or changes in said sections 211 to 307 which may hereafter be enacted shall, unless otherwise specifically provided therein, be deemed to apply to and to govern said School Administrative District No. 73."

At the outset defendants District and Board challenge the standing of these plaintiffs to bring this action in its present form. They assert that plaintiffs must show special injury to themselves not common to other taxable inhabitants of the District. For reasons which will appear we conclude that these plaintiffs have standing to launch their attack upon the validity of the organization of the District but not upon the dissolution procedure.

14 M.R.S.A., Sec. 6051, subs. 12 and 13, dealing with the equity jurisdiction of the Superior Court, reads as follows:

"12. Pledging credit of public corporation for purpose not authorized by law. When * * * School Administrative Districts, * * *, *for a purpose not authorized by law,* vote to pledge their credit or to raise money by taxation * * * or to pay money from their treasury, or if any of their officers or agents attempt to pay out such money for such purpose, the court shall have jurisdiction on complaint filed by not less than 10 taxable inhabitants thereof, briefly setting forth the cause of complaint.

"13. Equity jurisdiction. And have full equity jurisdiction, according to the usage and practice of courts of equity, in all other cases where there is not a plain, adequate and complete remedy at law." (Emphasis ours)

Sub. 12 antedated the broader provisions of Sub. 13 which was enacted in 1874.[2] Both provisions, however, have been relied upon to confer jurisdiction upon the court to grant *preventive* relief in appropriate cases to persons showing themselves interested as taxable inhabitants.

It is revealing to discover that from its very inception the predecessor of Sub. 12 was carefully phrased to provide only *preventive* relief at the behest of ten taxable inhabitants. The law was first enacted as P.L.1864, Ch. 239, Sec. 1 in these terms:

"Chapter 239

An act to *restrain* illegal appropriations of public money.

Be it enacted by the Senate and House of Representatives in Legislature assembled, as follows:

Sect. 1. When any county, city, town or school district votes to pledge its credit, or to raise by taxation, or to pay from its treasury, any money, for any purpose other than those for which it has the legal right and power, or any agent or officer thereof attempts to pay out the money of such county, city, town or school district without authority, the supreme judicial court may, upon the suit or petition of not less than ten taxable inhabitants thereof, briefly setting forth the cause of complaint, hear and determine the same in equity. Any justice of said court may in term time or vacation, issue injunctions and make such orders and decrees as may be necessary or proper *to restrain or prevent* any violation or abuse of such legal right or power until the final determination of the cause by said court." (Emphasis ours)

The three cases decided under the 1864 law prior to 1874 were Clark v. Wardwell

---

2. The substance of Sub. 12 may be found in R.S.1871, Ch. 77, Sec. 5, Subsection

9. The predecessor of Sub. 13 was enacted as P.L.1874, Ch. 175.

(1867) 55 Me. 61; Johnson v. Thorndike (1868) 56 Me. 32; and Marble v. McKenney (1872) 60 Me. 332. All involved applications for preventive relief by injunction.

In Blood v. Beal (1905) 100 Me. 30, 60 A. 427 the plaintiffs were 14 taxable inhabitants of the City of Bangor. The defendants were officers and committee members with delegated authority, the City of Bangor not being a party. The Court *prevented* the making of a contract, the performance of which would have exceeded the City's authorized debt limit. Recognizing that this was not a case involving "a purpose not authorized by law," (Sub. 12), the Court rested jurisdiction squarely upon its broad equity powers, (Sub. 13).

In Eaton v. Thayer (1925) 124 Me. 311, 314, 128 A. 475, however, in an action brought by "fourteen citizens living and owning property" in the Kennebec Water District, the Court declined to accord the plaintiffs standing to obtain *remedial* relief. The Court said, "But this bill does not seek *preventive* relief against anticipated or threatened unauthorized action by the Trustees. It seeks *remedial* action only after the commission of an alleged illegal act." (Emphasis ours). The Court indicated that *remedial* action might be instituted by the Attorney General upon the relation of persons interested where the public is affected. The Court noted that if these plaintiffs and others similarly situated could seek remedial relief, there would exist an "opportunity for multiplicity of suits" which "is not for the public interest."

The standing of ten taxable inhabitants to seek *preventive* relief was challenged in Tuscan v. Smith (1931) 130 Me. 36, 43, 153 A. 289, 293. Concluding that on the facts of the case the Court must base jurisdiction on its broad equity powers, Thaxter, J., carefully enunciated the liberal Maine view and the limits imposed thereon. The opinion stated:

"In 1874 the Supreme Judicial Court was given full equity powers, and since that time equitable remedies have been available to taxable inhabitants against cities and towns, except in so far as considerations of public policy and the discretionary powers of the courts may restrict them. It has always been conceded that the attorney general in the name of the state or on the relation of interested parties could bring a bill in equity in a case properly within the equity jurisdiction of the court to set aside illegal acts of municipal corporations. Dillon, Municipal Corporations (5 ed.) Sec. 1577. Some cases have held that the Attorney General is a necessary party and that a taxable inhabitant in his own name has no right to institute an action, where the act complained of is one which affects the entire public equally. Davis v. New York, [2 Duer (N.Y.)] 663; Miller v. Grandy, 13 Mich. [540]. It must be conceded that there is reason back of such a restriction. Municipal officers should not be subjected to litigation at the suit of every dissatisfied taxpayer. By the weight of authority today, however, taxable inhabitants are not barred from maintaining a bill in their own names in a proper case. Crampton v. Zabriskie, 101 U.S. 601, 25 L.Ed. 1070. In this case the Court said, page 609 of 101 U.S.: 'Certainly, in the absence of legislation restricting the right to interfere in such cases to public officers of the State or county, there would seem to be no substantial reason why a bill by or on behalf of individual tax payers should not be entertained to prevent the misuse of corporate powers. The court may be safely trusted to prevent the abuse of process in such cases.'

"Our court has very clearly defined the limits of such right. It has held that it should be restricted to an application for preventive relief, and that individual taxpayers have not the right to apply for remedial relief after the commission of an illegal act, where the act is one which affects the entire community and not specifically the individual bringing the

bill. Eaton v. Thayer, 124 Me. 311, 128 A. 475.

"We are aware that Massachusetts has held that the statute conferring general equity powers on its courts did not give the right to the individual taxpayer to file a bill. Baldwin v. Inhabitants of Wilbraham, 140 Mass. 459, 4 N.E. 829; Steele v. Municipal Signal Co., 160 Mass. 36, 35 N.E. 105; Prince v. Crocker, 166 Mass. 347, 44 N.E. 446. It is perhaps sufficient to say that this court has construed our own statute differently. Blood v. Beal, 100 Me. 30, 60 A. 427; Reynolds v. Waterville, 92 Me. 292, 42 A. 553; Eaton v. Thayer, supra.

"If therefore the action of the selectmen of the Town of Skowhegan in giving the lease here in question to Myron E. Smith was void under the principles of the common law, this court has jurisdiction in equity to enjoin the wrongful use by the lessee of the town property, to declare such contract void, and as incidental to such preventive measures to give such affirmative relief as may be appropriate."

But in Bayley et al. v. Town of Wells (1934) 133 Me. 141, 145, 174 A. 459, 461, the Court denied standing to 15 taxable inhabitants because they sought *remedial* relief. Here the Court said:

"Individual taxpayers of a municipal corporation have not ordinarily the right to sue for remedial relief, where the wrong, for which they seek redress, is one which affects the entire community and not specifically those bringing the action. Eaton v. Thayer, 124 Me. 311, 128 A. 475; Tuscan v. Smith, 130 Me. 36, 153 A. 289. This rule has its origin in a sound public policy, which holds that municipal officers should not be subjected to litigation at the suit of every dissatisfied taxpayer. This restriction, however, does not apply where the taxpayer seeks to prevent the commission by town officers of an illegal act. Both under the special provisions now embodied in Rev.Stat.1930, Ch. 91, Sec. 36, par. 13, and under the general equity powers given to the Supreme Judicial Court in 1874, the individual taxpayer has the right to apply for preventive relief. Tuscan v. Smith, supra.

"In the case before us, however, these plaintiffs are seeking remedial relief. Primarily they ask for an accounting of money claimed to be due. The injunction prayed for against the payment of the money by Wells to Ogunquit is merely incidental to such accounting. Under the well established rule in this state, they have no standing in court."

It is significant that this language makes it clear that whether plaintiffs base their claim to relief on Sub. 12 or on Sub. 13, they will in either case have no standing if the desired judicial action is *remedial* rather than *preventive*.

Standing was accorded to ten taxable inhabitants who sought to test the validity of a statute creating a school district and to enjoin the creation of indebtedness or payment of money in Kelley v. School District et al. (1936) 134 Me. 414, 417, 187 A. 703. Jurisdiction was rested on the then existing provisions of what is now Sub. 12.[3]

Again our Court reached a consistent result by holding that the Attorney General upon the relation of persons interested is the *only* proper plaintiff when *remedial* relief is sought. Burkett et al. v. Blaisdell et al. (1941) 137 Me. 200, 17 A.2d 460. Here a tax collector had converted collected excise taxes to his own use and the selectmen had declined to take appropriate action.

An interesting additional dimension was added by the reasoning of the Court in LaFleur ex rel. Anderson v. Frost et al. (1951) 146 Me. 270, 276, 80 A.2d 407, 411. Here were involved two companion cases, the first sounding in mandamus in which

3. The provision was then found in R.S.1930, Ch. 91, Sec. 36, CL. XIII.

the Attorney General was plaintiff, the second arising from a bill in equity brought by ten taxable inhabitants of the City of Portland but in which the Attorney General did not interest himself. We are here concerned only with the equity suit. There the plaintiffs sought to enjoin the submission to the voters of an ordinance providing for initiative and referendum. The plaintiffs asserted that the ordinance was invalid and if ratified would be null and void. An injunction was denied in the court below and in the interval pending appeal the ordinance was ratified by the voters and became effective. Plaintiffs nevertheless urged that the bill as of the time of appellate review should be viewed as presenting a proper case for declaratory judgment, the right to such a judgment being determined as of the date the bill was filed. The Court deemed that it "must look at the situation as it existed when presented to us" on appeal. The plaintiffs were denied standing, (1) because under the existing circumstances relief could only be remedial, and (2) because there no longer existed a justiciable controversy essential to warrant a declaratory judgment. In this connection the Court said, "The plaintiffs do not show there is a controversy between the parties by reason of which they are entitled to a judgment. A judgment would be not a declaratory judgment in the proper sense, but an advisory opinion given without warrant of authority on our part. 'It is essential that a controversy exist; for otherwise the petition would seek only an advisory opinion of the Court.' Maine Broadcasting Co., Inc. v. Eastern Trust & Banking Co. [et al.], (1946) 142 Me. 220, 49 A.2d 224, 225."

In Knapp v. Swift River Valley Community School District (1957) 152 Me. 350, 129 A.2d 790 ten taxable inhabitants of the district sought to enjoin the district and its trustees from, inter alia, borrowing or expending funds. The standing of the plaintiffs was challenged. The district had been duly organized and the legality of the initial organization was not questioned.

However, one of the member towns had subsequently upon a new vote taken a negative action upon all the questions upon which it had originally cast an affirmative vote in the course of organization of the district. Plaintiffs averred that this negative action effectively destroyed the capacity of the district to transact business lawfully. The Court accorded standing to the plaintiffs, viewing the action as one properly brought under what we have above referred to as a "Sub. 12"[4] proceeding to prevent "improper expenditures." The case was thereafter decided upon the merits adversely to the plaintiffs' contentions.

The leading case of McGary et al. v. Barrows et al. (1960) 156 Me. 250, 266, 163 A.2d 747, 756, is in many respects similar to the instant case. There ten taxable inhabitants of S.A.D. #9 sought a declaratory judgment and injunctive relief, testing the validity of the organization of the district and the constitutionality of the "Sinclair Act," so-called. In this case the standing of the plaintiffs was not challenged nor did we see any occasion to discuss the basis of our jurisdiction. The case was decided upon the merits. Defendants here direct attention to certain language in the opinion which in their view casts doubt upon the standing of plaintiffs. We said, "The interest of the taxpaying inhabitants in the creation and establishment of a school district is not a property interest." After quoting language found in Kelley v. School District, supra, our opinion continued, "Having no property interests at stake in the creation of the District, the plaintiffs cannot be said to have suffered a deprivation of property through the organization procedures under Sec. 111–G." The language must not be read out of context. We were not here concerned with standing but were merely dealing with an argument of counsel that the "Sinclair Act" deprived plaintiffs of property without due process of law. The disposition of this argument is in no way inconsistent with a position,

---

4. The provision was then found in R.S.1954, Ch. 107, Sec. 4, Sub. XIII.

tacitly assumed in McGray, that plaintiffs had standing to attack the legal existence of the district and seek *preventive* relief which would naturally flow from a decision favorable to them on that issue.

Later in the same year we decided Elwell et al. v. Elwell et al. (1960) 156 Me. 503, 167 A.2d 18. Here the parties attempted to raise an issue as to whether this was a "Subd. 12" case as contended by defendants or a "Subd. 13" case as argued by plaintiffs.[5] We declined to reach this issue since we deemed the merits of the controversy to have been fully decided by McGary. In our view, however, the Elwell Court was fully aware that plaintiffs had standing to seek preventive relief under "Subd. 13" in any event.

No issue as to the standing of plaintiffs was presented or considered in either Blackstone et al. v. Rollins et al. (1961) 157 Me. 85, 170 A.2d 405 or Peavy et al. v. Nickerson et al. (1962) 158 Me. 400, 185 A.2d 309, both of which were decided on the merits.

We have been at some pains to assemble and analyze chronologically the cases dealing with standing and jurisdiction in order that the guidelines for determination might emerge and be better understood by Bench and Bar. In the instant case jurisdiction to afford *preventive* relief to plaintiffs could be broadly based on both "Subd. 12" and "Subd. 13" since the somewhat more rigorous criteria of "Subd. 12" are here met.

14 M.R.S.A., Sec. 5954 provides in pertinent part:

"Any person * * * whose rights, status or other legal relations are affected by a statute, * * * may have determined any question of construction or validity arising under the * * * statute * * * and obtain a declaration

of rights, status or other legal relations thereunder."

This statute is procedurally implemented by M.R.C.P., Rule 57. 14 M.R.S.A., Sec. 5960 further provides:

"Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application therefor shall be by petition to a court having jurisdiction to grant the relief. * * *."

■■ Applying these general principles to the facts of the instant case, it is apparent that these plaintiffs pursuant to 14 M.R.S.A., Sec. 6051, Subs. 12 and 13 had standing to seek and the Court had jurisdiction to order a declaratory judgment and any *preventive* injunctive relief naturally flowing therefrom. In so saying, we refer only to plaintiffs' attack upon the constitutionality of the "Sinclair Act" and the validity of the organization of S.A.D. #73 thereunder. On the merits, however, we are not persuaded that we should overrule our prior case law. McGary disposed of all of the constitutional issues sought to be raised in the instant case and affirmed the conclusive effect of the certificate of organization issued by the Board. McGary was followed and reaffirmed in Elwell et al. v. Elwell et al., supra. Blackstone et al. v. Rollins et al., supra, reasserted McGary principles and in addition gave conclusive effect to the subsequent validation by special Act of the Legislature. Both McGary and Blackstone were relied upon and reaffirmed in Peavy et al. v. Nickerson et al., supra. The plaintiffs' attack upon the validity of the organization of S.A.D. #73 must fail.

■ Our approach to the legal effect of steps taken in an attempt to dissolve S.A.D. #73 must of necessity be somewhat

---

5. Plaintiffs were 14 taxable inhabitants of S.A.D. # 3. The defendants were the directors of the District, the State Treasurer and a bank. On the basis of prior authority defendants contended that if this was a "Subd. 12" action, the district was an omitted indispensable party.

different. As noted at the outset in this opinion the plaintiffs pray for a declaratory judgment "that the vote to dissolve School Administrative District #73 was not properly taken." Plaintiffs complain of some irregularities in the voting process but cannot and do not contend that S.A.D. #73 has as yet ever been effectively dissolved. Thus the most that plaintiffs could ever hope to achieve by way of relief would be *remedial* rather than *preventive*. It follows that the plaintiffs have no standing to seek the declaratory judgment prayed for with respect to the vote on dissolution. Moreover, the issue is moot and no justiciable controversy exists. The votes from the towns as certified to the Board and as corrected upon an inspection of the ballots produced a result unfavorable to dissolution. The Court cannot and will not speculate or surmise as to whether or not the result would be otherwise upon a new election. More than nineteen months have elapsed since the vote on the dissolution agreement prepared by the Board was taken. A dissolution agreement submitted to the voters pursuant to 20 M.R.S.A., Sec. 222 should reflect current conditions and presently existing assets and obligations of the district. It would be unfair and unwise to have a submission to the voters on a dissolution agreement already long outdated. The provision in Sec. 222 that "(t)he State Board of Education shall determine the date upon which all municipalities shall vote upon the dissolution agreement submitted to them" must be so construed. More than six months having elapsed since the vote was taken, any member town is free to institute a new petition for dissolution if ⅔ of the legal voters present and voting at a special meeting are so minded. They are therefore not without a remedy and no judicial intervention is required or even permissible at this stage.[6]

The entry will be

Judgment for defendants.

All Justices concurring.

---

6. It should also be noted that the enactment of P. & S.L.1971, Ch. 93, coming as it did subsequent to the attempted dissolution, effectively laid to rest any vestigial questions pertaining to the dissolution procedure and validated S.A.D. # 73 as a continuing legal entity as of September 23, 1971.