Herman COHEN

v.

Jack S. KETCHUM et al.

Herman COHEN et al.

v.

Edna L. WENTWORTH et al.

Herman COHEN et al.

v.

MAINE SCHOOL ADMINISTRATIVE
DISTRICT NO. 71 et al.

Supreme Judicial Court of Maine.

Sept. 19, 1975.

Murray, Plumb & Murray by Peter L. Murray, Portland, for plaintiffs.

Drummond, Wescott & Woodsum by Hugh G. E. MacMahon, Harry R. Pringle, Portland, David Roseman, Asst. Atty. Gen., Augusta, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

Before us are appeals from judgments entered in three civil actions separately instituted in the Superior Court (York County) and seeking various relief concerned, primarily, with a $5,200,000 school construction bond issue and its incidents.

The appeals were consolidated for presentation to this Court and we deal with them in a single opinion.

### I.—The History of the Litigation

On December 30, 1974 the Board of Directors of Maine School Administrative District No. 71 (hereinafter SAD No. 71)[1] determined upon a school construction bond issue and voted to seek approval of it by the voters of the District in an election called for January 22, 1975.

### I–A

Four days thereafter, on January 3, 1975, Herman Cohen instituted the first of the three actions under consideration. He sued as the only named plaintiff alleging himself a resident and taxpayer of the Town of Kennebunk, Maine. His subsequent motion to amend the complaint to add as parties plaintiffs ten other resident taxpayers of the Town of Kennebunk was denied by the presiding Justice.

The defendants in the action were the School District itself; Jack S. Ketchum, Jack L. Libby, Judith Dow, Robert E. Lewia, Daniel B. Beard, Frances Landry, David L. Sutter, Richard T. Littlefield and Theodore Towne, individually and in their capacities as members of the Board of Directors of the District; Arthur K. Hedberg, Jr., individually and as Superintendent of Schools of SAD No. 71; and the Maine State Board of Education.

The complaint alleged that the District School Board was apportioned in violation of the "one person-one vote" principle controllingly prescribed by 20 M.R.S.A. § 301, as amended. Plaintiff sought a declaration of malapportionment, an order for reapportionment, and an injunction prohibiting, pending reapportionment, issuance of the proposed school construction bonds.

1. SAD No. 71 was organized pursuant to 20 M.R.S.A. § 211 et seq., as amended, and is a body politic and corporate composed of the residents of the territory within the towns of Kennebunk and Kennebunkport.

## I–B

On January 14, 1975 Cohen, this time joined by ten other resident taxpayers of the Town of Kennebunk (who were the same persons Cohen had moved to add as plaintiffs in the first action), sued Edna L. Wentworth, individually and in her capacity as Clerk of the Town of Kennebunk, F. Herbert Severance, individually and in his capacity as Clerk of the Town of Kennebunkport, Maine, School Administrative District No. 71, and Arthur K. Hedberg, Jr., individually and as Superintendent of Schools of SAD No. 71.[2]

In this second action plaintiffs alleged, as had Cohen in the first action, that the SAD No. 71 Board of Directors was malapportioned. They added a second claim that the warrant calling for the January 22, 1975 election was fatally defective.

Plaintiffs asserted that the illegalities of a malapportioned Board acting to call the election by a fatally infirm warrant justified a restraining order against the imminent election and an injunction against issuance, pending reapportionment of the Board, of any warrant calling for any other election to approve any other school construction bond issue.

The presiding Justice refused to restrain the election. It was held on January 22, 1975 and produced voter approval of a $5,200,000 school construction bond issue.

## I–C

Two days after the election, on January 24, 1975, the same persons who were the plaintiffs in the second action instituted the last of the three actions before us. They sued Maine School Administrative District No. 71, and Arthur K. Hedberg, Jr., individually and in his capacity as Superintendent of Schools of SAD No. 71.[3]

The complaint reasserted the claims of illegality made in the second action: malapportionment of the School Board and a fatally defective warrant for the call of the election. Plaintiff sought a declaration adjudicating these infirmities and an injunction, pending reapportionment, against issuance not only of the bonds already approved but also any other school construction bonds.

Concluding that the SAD No. 71 Board of Directors was validly apportioned and the warrant calling for the election to approve the bond issue was proper, the presiding Justice denied all relief sought in each of the three actions.

## II.—Interrelated Matters of Standing, Mootness and Jurisdiction

We direct preliminary attention to various questions of standing, mootness and jurisdiction precipitated by the different postures in which the cases are before us.

## II–A

### The first action (Cohen v. Ketchum, et al)

In this action, as previously mentioned, a single named plaintiff has sued as a resident taxpayer of the Town of Kennebunk. Since this sole plaintiff has neither alleged nor proved that he is a *duly qualified voter,* he has neither alleged nor proved that he suffered such damage as, under *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962) relative to malapportionment claims, may constitute special damage:—that the alleged malapportionment has diluted the power of plaintiff's vote relative to that of other voters.

■ As a plaintiff suing without special injury, Cohen lacks standing to achieve

---

2. Originally named but subsequently eliminated as defendants in this second action were the nine members of the SAD No. 71 Board of Directors named as defendants in the first action.

3. The School Board members were named as original defendants but were subsequently eliminated as parties.

any form of remedial relief concerning allegedly illegal action by a local governmental body to which he has the relationship of a resident taxpayer. If plaintiff is to have relief at all, he must show himself entitled to preventive relief. *Blodgett v. School Administrative District 73,* Me., 289 A.2d 407 (1972).

The question remains, however, whether even preventive relief may be afforded to the plaintiff, Cohen, insofar as, without suffering special damage, he has sued as the only named plaintiff and is not joined by at least nine other resident taxpayers of the local governmental unit alleged to be engaging in illegal activity.

In *Eaton v. Thayer,* 124 Me. 311, 128 A. 475 (1925) more than ten taxpayers had sued, invoking the so-called special equity enabling "ten taxpayers" statute (then R.S. 1916, Chapter 82 § 6, par. XIII).[4] Because the illegality alleged to inhere in the governmental action under attack was of a kind other than that delineated in this special statute, it was held inapplicable to the case. The Court concluded, however, that this deficiency would not defeat the standing of plaintiffs to have preventive relief pursuant to the full equity jurisdiction embodied in R.S.1916, Chapter 82 § 6, par. XIV (reflecting the grant of full equity jurisdiction originally conferred in 1874 by P.L.1874, Chapter 175). The Court said:

> "Since this enlargement of the equity powers . . . jurisdiction to grant preventive relief has been regarded *as not limited as by Paragraph XIII* [the so-called "ten taxpayers" special equity enabling statute]." (p. 314, 128 A. p. 476) (emphasis supplied)

In *Tuscan v. Smith,* 130 Me. 36, 153 A. 289 (1931) an action by "ten taxable inhabitants" of the Town of Skowhegan claimed that a lease given by the Town to one of the defendants and assigned to another of the defendants was illegal because (1) one of the selectmen was pecuniarily interested in the grant of the lease and its assignment, and (2) the lease had been

> "knowingly made for a less rental than could have been obtained from other parties . . . ." (p. 38, 153 A. p. 291)

Plaintiffs sought cancellation of the lease and

> "an injunction against the lessee or his assignee taking possession of the demised premises." (p. 38, 153 A. p. 291)

As in *Eaton v. Thayer,* the Court in *Tuscan v. Smith,* because of the nature of the illegality asserted, was obliged to hold the special "ten taxpayers" equity enabling statute inapplicable. Again, however, as in *Eaton v. Thayer,* the Court held that this was not fatal to plaintiffs' maintenance of the action since once "full equity powers" had been conferred, according to

> "the weight of authority . . . taxable inhabitants [without special damage] are not barred from maintaining a bill in their own names in a proper case." (pp. 43, 44, 153 A. p. 293)

As to the criteria of a "proper case" *Tuscan v. Smith* stated:

> "Our court has very clearly defined the limits of such right. It has held that it should be restricted to an application for preventive relief, and that individual taxpayers have not the right to apply for remedial relief after the commission of an illegal act, where the act is one which affects the entire community and not specifically the individual bringing the bill." (p. 44, 153 A. p. 293)

In *Eaton v. Thayer* and *Tuscan v. Smith* —as in all subsequent cases which have addressed the standing issues here under consideration (including *Blodgett v. School Administrative District 73,* Me., 289 A.2d 407 (1972))—the named plaintiffs happened to be ten or more resident taxpayers. For this reason, uncertainty has per-

4. Currently, this same special "ten taxpayers" statute is found as 14 M.R.S.A. § 6051.(12).

sisted whether fewer than ten resident taxpayers—or, indeed, one such named plaintiff—will have standing to sue, without special damage, to achieve preventive relief by invoking the "full equity powers" of Maine Courts as currently embodied in 14 M.R.S.A. § 6051 (13).

We now have occasion to remove this uncertainty and clarify the law of Maine.

The underlying logic of the reasoning in *Eaton v. Thayer* and *Tuscan v. Smith* is that once full equity jurisdiction was conferred upon Maine Courts (after 1874), the need to establish the special conditions required by the so-called "ten taxpayers" statute had been superseded. In practical effect, in short, the restricted equity jurisdiction conferred by the "ten taxpayers" statute had become a vestigial relic of the step-by-step evolution of equity jurisdiction in this State which ultimately culminated, in 1874, in the grant of a total equity jurisdiction. Such is the plain meaning of the statement:

> "Since . . . enlargement of the equity powers . . . jurisdiction to grant preventive relief has been regarded as not limited as by Paragraph XIII." (p. 314 of 124 Me., p. 476 of 128 A.)

This abstract logic of *Eaton v. Thayer* and *Tuscan v. Smith* is given concrete shape in *Tuscan v. Smith* in two respects.

First, in illustrating that the weight of authority recognizes

> "taxable inhabitants . . . [may maintain] a bill in their own names",

*Tuscan v. Smith* cites *Crampton v. Zabriskie,* 101 U.S. 601, 25 L.Ed. 1070 (1879), a case in which only three resident taxpayers were named plaintiffs seeking preventive relief against illegal governmental action causing them no special injury. This citation reveals that the Court in *Tuscan v. Smith* saw no magic in "ten" as the minimum number of resident taxpayers who have standing to invoke the

> "full equity jurisdiction, according to the usage and practice of courts of equity, . . . where there is not a plain, adequate and complete remedy at law." 14 M.R.S.A. § 6051 (13)

■ Second, *Tuscan v. Smith* indicates that as there is no magic in "ten", there is none in any plurality of resident taxpayers as the named plaintiffs. This appears from the manner in which the Court describes the difference between the law of Maine and the law of Massachusetts. The Court says:

> "We are aware that Massachusetts has held that the statute conferring general equity powers on its courts did not give the *right to the individual taxpayer* to file a bill. . . . It is perhaps sufficient to say that this court has construed our own statute differently." (130 Me. p. 44, 153 A. p. 293) (emphasis supplied)

The use of the singular, "the individual taxpayer", is further confirmation that the ultimate import of the logic of the Court's analysis is that neither ten nor, indeed, a plurality of resident taxpayers must be the named plaintiffs in an action in which, in the absence of special injury, preventive relief is sought. For such purpose, even one person as the named plaintiff has standing to seek to achieve preventive relief against illegal action by a local governmental unit of which plaintiff is a resident taxpayer—especially when, as here, the asserted illegality relates to a subject matter of direct interest to any taxpayer, the incurring of governmental indebtedness. We now so decide.

■ In the first action, then, Herman Cohen suing as a solitary resident taxpayer suffering no special damage has standing to invoke the full equity jurisdiction conferred upon the Superior Court by 14 M.

R.S.A. § 6051(13) for an award of appropriate preventive relief against the particular local governmental action complained of by him as illegal.

## II–B

### The second action (Cohen, et als v. Wentworth, et al)

This second action instituted by Herman Cohen and ten other resident taxpayers of the Town of Kennebunk sought: (1) to restrain holding of the election imminently scheduled for January 22, 1975, and (2) on the assumption that the election would be stopped, to enjoin the School Board from issuing another warrant for another school construction bond election pending reapportionment of the Board.

■ As to the claim of illegality predicated on malapportionment of the Board, plaintiffs have made such contention without alleging or proving themselves to be duly qualified voters of SAD No. 71. Hence, as elaborated concerning the first action (ante, p. 390), plaintiffs must be held to be claiming a malapportionment causing them no special damage. They are, therefore, without standing to be awarded any form of remedial relief and may have an adjudication on the malapportionment question only if a finding of malapportionment would entitle them to the preventive relief they seek.

■ The same is true of plaintiffs' claim of fatal defects in the warrant calling the election of January 22, 1975 since, as to such illegality, plaintiffs have sustained no special damage but share only such injury as the illegality would cause all of the resident taxpayers of the Towns of Kennebunk and Kennebunkport—the two municipalities constituting SAD No. 71.

With the standing of plaintiffs thus denying them right to any remedial relief—including such remedial relief as would nullify the election already held and invalidate the legal effectiveness of the voter approval produced by the election,—and since it is in the nature of things that this Court cannot prevent events which have already occurred, the issue of restraining the election of January 22, 1975 is moot. See: *LaFleur ex rel. Anderson v. Frost,* 146 Me. 270, 80 A.2d 407 (1951).[5]

■ Furthermore, the holding of the election and the approval of the voters produced by it have now rendered hypothetical and academic the question of whether the Court should enjoin the issuance of future warrants calling future elections. Since plaintiffs lack standing to be granted remedial relief by which this Court might set aside the election held on January 22, 1975 and vacate the legal effect of the voter approval achieved in that election, whether other bond issue elections should be held in the future is a question lacking the current pragmatic vitality to render it justiciable. A decision of such issue, here, would be an advisory opinion by this Court in a context in which it lacks jurisdiction for the purpose. See: *LaFleur ex rel. Anderson v. Frost, supra.*

Since the issues presented to us by the appeal in the second action, *Cohen, et als v. Wentworth, et als,* are thus either moot or beyond this Court's jurisdiction to decide, that appeal must be dismissed.

## II–C

### The third action (Cohen, et als v. Maine School Administrative District No. 71, et al)

In this third action Herman Cohen, again joined by ten other resident taxpay-

5. As was said in *LaFleur ex rel. Anderson v. Frost, supra,* in our appellate determination of the standing of the plaintiffs relative to what relief will be remedial and what preventive, " . . . we must look at the situation *as it existed when presented to us.*" (p. 275, 80 A.2d p. 410) (emphasis supplied) See also the discussion of *LaFleur v. Frost* in *Blodgett v. School Administrative District 73, supra,* 289 A.2d at pp. 411, 412.

ers of Kennebunk, sought to prevent issuance of the school construction bonds the commitment for which the voters of the District had previously authorized at the election held on January 22, 1975.

As in the second action, here, too, the named plaintiffs are without special damage as to the alleged warrant illegalities. Also, as in the first and second actions, because they have failed to allege and prove that they are duly qualified voters, they are without the special damage attributable to a dilution of their voting power.

■ In this posture of the third action, then, plaintiffs therein have standing to achieve an adjudication of their claims of malapportionment and fatal infirmities in the warrant only as such decision would entitle them to preventive relief against issuance of the school construction bonds under attack. *Blodgett v. School Administrative District 73, supra.*

\* \* \*

Having clarified the matters of standing, mootness and jurisdiction, we now turn to the substantive claims in the two actions (the first and the third) which remain viable before us.

### III.—The Alleged Illegality of Malapportionment

Because the standing of plaintiff Cohen in the first action and of the plurality of the plaintiffs in the third action authorizes a decision of the malapportionment question only as such decision is necessary to justify the preventive relief sought by plaintiffs, we find it unnecessary to reach the merits of the malapportionment issue in either of the actions. The reason is that hypothesizing, arguendo, that the Board were to be pronounced malapportioned, we must nevertheless deny plain-

tiffs the preventive relief they seek:—an injunction against issuance of the school construction bonds (now approved by the voters of SAD No. 71).

When a District Board determines to borrow funds for capital improvement purposes (as defined in 20 M.R.S.A. § 3457) it must, by warrant, call an election to achieve the approval of the voters in accordance with the steps specified in Section 225. By Section 304 voter approval of the Board decision to issue bonds or notes of the District is a prerequisite to such issuance (with exceptions not here material).

The capital improvement project and accompanying bond issue initiated by the SAD No. 71 Board on December 30, 1974 and ratified by the District's voters on January 22, 1975 fulfilled these statutory preconditions.

As to Board action yet necessary for completion of the issuance of the bonds, our opinion is that Section 304 shows that although discretionary decisions are involved—including determining the dates, denomination, interest rate, and method of sale as well as other particular features relating to the form of securities, minimum purchase price, and dates of maturity,—these actions yet to be undertaken are truly the implementation of a capital construction commitment already in essence undertaken.

■ As we have stressed ante, plaintiffs' standing before us precludes us from affording them any type of remedial relief. In no event, therefore, are plaintiffs entitled to have vacated and set aside the foundational commitment to the school construction project which has thus already come into existence. *Blodgett v. School Administrative District 73, supra; LaFleur ex rel. Anderson v. Frost, supra.*[6]

---

6. The point made in footnote 5, supra, is applicable here. Although plaintiff Cohen brought the first action before the election was held and thus had opportunity to prevent the holding of the election if the presiding Justice in the Superior Court had agreed with him, our appropriate function, as an appellate tribunal evaluating the difference between remedial and preventive relief, is to ". . . look at the situation as it existed when presented to us" rather than as it was at the time Cohen instituted the first action.

Over and above the matter of the standing of plaintiffs, the unique nature of the malapportionment question itself has produced a general consensus that notwithstanding a judicial pronouncement that an elected body exercising governmental functions is malapportioned, actions of the body taken prior to the issuance of the malapportionment pronouncement are unaffected as to their legal validity and remain lawful.

Some Courts have arrived at this view by analogizing the status of a malapportioned governmental body to that of a de facto officer acting under color of office. See, for example, *Kidd v. McCanless,* 200 Tenn. 273, 292 S.W.2d 40 (1956); appeal dismissed 352 U.S. 920, 77 S.Ct. 223, 1 L. Ed.2d 157 (1956). The approach of other Courts is that the likelihood of the chaos resulting from the overturning, on malapportionment grounds, of legislative action already taken requires that such action be upheld as a pragmatic necessity. See, for example, *State ex rel. Tayrien v. Doggett,* Okl.Cr., 296 P.2d 185 (1956).[7]

We believe that, regardless of differences in the subsidiary approaches adopted by individual courts, the ultimate principle on which they agree reflects an overriding policy concern that the law must afford protection when an elected governmental body has been proceeding under color of right because of the reliance justifiably placed by the public. Such policy has long been favored by this Court. *Hooper v. Goodwin,* 48 Me. 79 (1861); *State v. Poulin, alias Pooler,* 105 Me. 224, 74 A. 119 (1909).[8] In *Poulin* this Court expressly adverted to the practical necessities underlying the policy, saying:

"It would be unreasonable to require the public to inquire into the title of an officer, or compel him to show title, and these have become settled principles of law." (p. 229, 74 A. p. 121.)

We, therefore, adhere to the general current of authority already developed and decide that the legal validity of the actions of a governmental body taken prior to a judicial pronouncement that the body is malapportioned are unaffected by such pronouncement.

Beyond the foregoing general principle, a special feature of the instant case buttresses our conclusion that the past action of the Board in determining upon a school construction bond issue would continue legally valid despite an adjudication of malapportionment. Here, the commitment to a school construction capital outlay program was undertaken not only by representatives of the voters of SAD No. 71 but also by the voters themselves. Thus, the particular taint introduced when an elected body is malapportioned—that the Board's representational voting does not reflect equally the voting power of the people— was here purged when the people approved the project by their own direct vote.

With our point of departure, then, that as to the malapportionment question, the action of the School Board on December 30, 1974 which determined upon the issuance of the school construction bonds was, and remains, legally valid—as also the approval of the electorate given in the elec-

7. For a discussion of the overall problem, see: Beiser, The Status of a Malapportioned Legislature. 72 Dick.L.Rev. 553 (1968).

8. We are aware that Courts have disagreed concerning whether one can be a de facto officer without a de jure office. Cf. *Norton v. Shelby County,* 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886) with *Lang v. Mayor, etc., of City of Bayonne,* 74 N.J.L. 455, 68 A. 90 (1907).

This Court, however, has concluded that reason does not support this distinction and has applied the de facto doctrine to the acts of the holder of a de facto office. *State v. Poulin, alias Pooler, supra.*

In any event, the issue is not critical in the present situation since, regardless of whether its particular constituency has been established by a valid apportionment, the SAD No. 71 Board of Directors, existing as a legal entity, is a body established de jure by 20 M.R.S.A. § 301.

tion held on January 22, 1975,—we proceed to evaluate whether the actions yet remaining to be taken by the Board would be properly enjoinable were we now to adjudicate the Board to be malapportioned.

Our view is that since these prior occurring matters remain lawful, the substantive essence of the commitment which the bond issue would represent is already lawfully established with only finishing touches remaining to bring it to fruition.

■ We regard the decision by the School Board to initiate the school construction capital improvement project through the issuance of securities under 20 M.R.S.A. §§ 225 and 304, and the subsequent required voter approval, as the two actions critical to issuance of the bonds. The judgments which are yet to be made by the School Board under Section 304 relate only to the manner in which they may issue securities once the Directors and people have determined that the securities shall issue. No further vote of either the Directors or the electorate is necessary to the existence of the basic commitment for capital outlay which the issuance of the bonds would impose.

The form of warrant calling the voters to approve such a capital improvement plan, as prescribed by 20 M.R.S.A. § 225, requires that all details essential to the plan must appear in the warrant: namely, the maximum indebtedness sought to be authorized, the type of school to be constructed, and its location. Thus, the procedures specified by Section 225 include all essential elements of School District borrowing. Once they have been complied with, as here, only the executory steps outlined in Section 304 remain.

In this regard, we find significant the following provision in Section 225(3)(A) regarding change in construction site *after* voter ratification:

"When a School Administrative District votes to change the site of its school construction project . . ., the date

of authorization of the project shall be the original date whereby the voters authorized the directors to issue bonds or notes for the same project."

We look upon this provision, requiring a relation back of amendments to capital improvement plans to the date of the original referendum, as significant indication of legislative intent that voter approval is the second and last of the two steps crucial to bring into existence the actual commitment to undertake the capital outlay obligation to be embodied in the school construction bonds ultimately issued.

Beyond this conclusion that the heart of the bond commitment has already been validly settled and only incidents of implementation remain, a further factor unique to malapportionment considerations here supports a conclusion that a current pronouncement of malapportionment of the SAD No. 71 Board of Directors would not justify an injunction to prohibit the Board's undertaking of the further acts necessary to complete the school construction bond issue approved by the voters.

In Section 301 of 20 M.R.S.A. the Legislature has commanded that

"[t]he directors of a School Administrative District during . . . reapportionment . . . shall serve until the reapportionment is completed and *shall be legal representatives of the district* until the reapportioned board is selected and qualified." (emphasis supplied)

The Legislature has further mandated that, as such "legal representatives of the district", pending reapportionment,

"[t]he directors shall carry out all business of the district including the borrowing of necessary funds which may be required during the period of board reapportionment."

In *Fortson v. Morris,* 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966) the Supreme Court of the United States expressly permitted the Legislature of Georgia, previously adjudicated to be malapportioned,

to continue to act with legal validity—even to the extent of undertaking the momentous action of electing the Governor of the State. Overturning the District Court's order restraining such election, the Supreme Court said:

"In *Toombs v. Fortson*, 384 U.S. 210 [86 S.Ct. 1464, 16 L.Ed.2d 482], affirming [D.C.], 241 F.Supp. 65, we held that with certain exceptions, not here material, the Georgia Assembly could continue to function until May 1, 1968. Consequently the Georgia Assembly is not disqualified to elect a Governor as required by Article V of the State's Constitution." (p. 235, 87 S.Ct. p. 449.)

We find the express commands of the Maine Legislature in Section 301—that a malapportioned School Administrative District Board of Directors has the status of being the "legal representatives of the district" and has legal authority "to carry out all business of the district" (at least for a reasonable time after a pronouncement of malapportionment)—as having legal effect here equivalent to that of the judicial recognition in *Toombs v. Fortson, supra,* of the continuing lawful authority of the malapportioned Georgia Assembly to act.

In sum, then, even were we presently to hold the SAD No. 71 Board of Directors malapportioned, such adjudication would not justify an award of the preventive relief as to which alone plaintiffs have standing in the first and third actions before us, to-wit, an injunction prohibiting the Board from completing the issuance of the school construction bonds approved by the electorate on January 22, 1975. We, therefore, have no present occasion to decide the malapportionment question.

*IV.—The Alleged Illegality of Fatal Defects in the Warrant*

We find without merit the claim of plaintiffs in the third action that the ultimate issuance of the school construction bonds should be enjoined on the ground that there were fatal defects in the warrant which rendered illegal the election at which the people approved the project.

Plaintiffs concentrate their attack upon Article 2 of the warrant reading as follows:

"*Article 2.* Shall the School Directors of School Administrative District No. 71 be authorized to issue bonds or notes in the name of said District for capital outlay purposes in an amount not to exceed five million, two hundred thousand dollars ($5,200,000) to finance the costs of (i) constructing a new High School to be located in the Town of Kennebunk on the westerly side of Sea Road diagonally across from the existing town dump on property formerly owned by Rodney Ross and designated as lot number 13A on Kennebunk Tax Assessors Map 30 and (ii) remodeling the present High School and adjacent Junior High School for use as a Middle School on Fletcher Street in Kennebunk, said bonds or notes to be in lieu of the $4,800,000 authorized on June 11, 1974, which authorization will be deemed rescinded upon an affirmative result on this Article? (State law (20 M.R.S.A. 3457) now provides that the District will be reimbursed for construction costs and debt service incurred on account of approved school construction projects. The bonds or notes authorized hereby will not be issued until and unless such approval is obtained.)"

The infirmities claimed by plaintiffs are: (1) the language deviates from the form prescribed by 20 M.R.S.A. § 225(3) and, therefore, the warrant must be held invalid either because (a) no deviation from the statutory form is tolerable, or (b) in any event, the deviations here are of a substantive nature likely to confuse the voters; (2) the warrant posed questions in a manner incapable of answer; (3) the warrant denied the voters options they were entitled to have submitted to them; (4) the inclusion in the warrant of a question relat-

ing to the rescission of a prior bond issue was a fatal defect because the voters lacked authority to make such decision.

We disagree with all the contentions.

■ We reject out of hand the claim that any deviation from the statutory form, regardless of its substantive impact, renders the warrant fatally deficient.[9] Only that deviation is fatal which defeats the manifest legislative purpose underlying the statutory prescription of a form:—that the issues to be voted upon be intelligibly presented to the electorate. See: *Opinion of the Justices*, 107 Me. 514, 78 A. 656 (1910); *Dick v. Roberts*, 8 Ill.2d 215, 133 N.E.2d 305 (1956); *People ex rel. Davis v. Chicago, Burlington and Quincy Railroad Company*, 48 Ill.2d 176, 268 N.E.2d 411 (1971).[10]

Here, plaintiffs focus upon two deviations as being substantively sufficient to require invalidation of the warrant.

They say, first, that the Board did not present the issues intelligibly to the voters because it combined the funding of the construction of a new High School with the remodeling of the existing Senior and Junior High Schools and the rescission of a prior bond issue as incident to the authorization of a new bond issue.

Plaintiffs assert, second, that the two sentences added in the parenthesis at the end of Article 2 contained information likely to create erroneous impressions in the minds of the voters.

We find both claims without merit.

■ Plainly, the references in the warrant to the rescission of the prior $4,800,000 bond issue, the remodeling of two existing schools and the construction of a new Senior High School gave no mis-

leading information to the voters. Rather, it gave them correct information which they were entitled to know as having material bearing on the proposed school construction taken as an entire project.

Similarly, by bringing to the attention of the voters that the remodeling of two existing buildings and of the construction of another building were functionally dependent parts of an integrated program—to-wit, that the project of constructing the new High School necessitated the remodeling of existing facilities,—the warrant provided the voters with accurate information concerning the totality of the school construction undertaken which it was appropriate that the voters know.

Arguably, then, the claim of plaintiffs is sustainable only in its thrust that it presented unintelligible choices to the voters by requiring a single answer to a multiplicity of questions incapable of such answer.

This contention must be rejected. In substance, the warrant asked the voters whether they wished to retain the existing bond authorization of $4,800,000 or to substitute for it (by rescinding it and approving) a bond issue in the specified higher amount of $5,200,000. If a majority of the voters favored the status quo, a "no" vote by them would clearly maintain it; if the majority wished to increase the authorized indebtedness, their "yes" votes would establish the increase.

Similarly, because the remodeling of the two existing buildings and the construction of an additional building were functionally dependent features of an overall integrated project, a "yes" vote would approve the total project and a "no" vote would adequately manifest rejection of the total project.

9. 20 M.R.S.A. § 225(3)(A), in setting forth the form of warrant to call an election to issue bonds, directs that "the questions to be inserted in all warrants shall be *substantially* as follows:" (emphasis supplied)

10. The statute in *People ex rel. Davis v. Burlington and Quincy Railroad Company, supra,* like 20 M.R.S.A. § 225(3)(A), directed that the ballot be in "substantially" the prescribed form.

Plaintiffs' argument is also unconvincing in its import that by combining questions as it did, the Board denied the voters options which should have been afforded them. As to the contention that the voters should have been given opportunity to decide separately whether (1) they favored rescission of the previously approved bond issue (without replacement of it by a new bond issue) and (2) they wished to authorize a new issue in some amount other than $5,200,000, we know of no legal principle, and plaintiffs have called none to our attention, requiring the Board to submit such matters as discrete questions for voter decision. We are likewise unaware of a governing legal principle requiring the Board to submit the question of the construction of the new High School independently of the question of the remodeling of the two existing schools.

The Board was authorized to have the voters accept or reject the proposed capital improvement plan as a total project. The basic function of School Directors is to make the initial choice of options to be put to referendum. The School Directors of the District have the duty, and the power, to manage the affairs of the School District. 20 M.R.S.A. § 301. It is for them to decide upon the matters to be presented to the electorate when elections are necessary to approve bond issues for school construction. 20 M.R.S.A. § 225.

■ We hold unavailing the argument of plaintiffs concerning the language appearing in the parenthesis at the end of Article 2 which adverts to 20 M.R.S.A. § 3457 and informs the voters that (1) state law provides for reimbursement by the State to the School Administrative District of the costs of construction and debt, and (2) should State reimbursement for the bond not be forthcoming, the bonds will not be issued.

Plaintiffs' contention that such information was misleading is erroneous. Under the provisions of 20 M.R.S.A. § 3457 the Commissioner of Education

". . . *shall* allocate state financial assistance to School Administrative Districts on school construction approved subsequent to the formation of such districts, and on school debts, . . .." (emphasis supplied)

Once approval is forthcoming, reimbursement is contemplated as mandatory and automatic. That a legislative appropriation may not be forthcoming does not inject inaccuracy into the information. It is common knowledge that the Legislature may fail to appropriate monies for programs at any time. We attribute such knowledge to the voters of SAD No. 71 (in the absence of any special evidence here suggesting that the SAD No. 71 voters may have believed otherwise).

Further, plaintiffs gain nothing by characterizing Section 3457 as recent and controversial legislation which should not have been mentioned to the voters without indication of the controversy surrounding it. We disagree with the characterizations. The facts are that the Legislature first provided for State financial support of local school construction in 1957. (P.L.1957, Chapter 364, Section 1). The 1973 amendment to which plaintiffs refer merely increased the percentage of that State support. (P.L.1973, Chapter 571, Section 15). This factual history does not fairly indicate the kind of controversy which would make a legislative appropriation highly unlikely and thus so speculative as to render misleading the statement in the warrant that State law provides for reimbursement of the costs of construction and the indebtedness.

In any event, even were we to assume that the mention of provision for reimbursement was misleading, it would be inconsequential. The second sentence clearly indicates that issuance of the bonds is contingent on State financial assistance.

Hence, even if State reimbursement be not forthcoming, the bonds simply will not be issued and no liability unexpected by the voters will have been incurred.

Decisions in other jurisdictions tend to support our conclusion here that the warrant calling the election on January 22, 1975 was not fatally defective.

In *City of Raytown v. Kemp,* 349 S.W. 2d 363 (Mo.1961), the Supreme Court of Missouri upheld a sewerage bond issue against an attack that the ballot included information not required by the statutory form concerning which taxpayers would be assessed for payment.

In *Knapp v. Unified School District No. 449,* 209 Kan. 237, 496 P.2d 1400 (1972) the Court confronted facts strikingly similar to those before us. The ballot in *Knapp* stated that the amount of the subject bond issue would be reduced by any federal grants received. Turning aside a claim that the amount of federal grants should have been specified, the Supreme Court of Kansas held that the statement was not misleading.

Finally, we find without merit the contention of plaintiffs that the warrant contained independently illegal matters in that it asked the voters to undertake action beyond their legal authority, namely, to rescind the previously approved bond issue of $4,800,000.

■■■■■ It was long ago settled in this jurisdiction that it is an inherent right of voters to revoke an authority previously given by them when, as here, no innocent third party has relied to his detriment on the earlier authorization. In *Getchell v. Inhabitants of Wells,* 55 Me. 433 (1867), this Court approved the rescission by that Town's voters of an appropriation for snow

removal. Similarly, in *Blaisdell v. Inhabitants of the Town of York,* 110 Me. 500, 87 A. 361 (1913), we upheld the dismissal of a committee authorized at a previous town meeting to build a bridge. More recently, we recognized the authority of the voters of North Berwick to rescind earlier approval of the formation of a School Administrative District where no third party rights had intervened. See: *Inhabitants of the Town of North Berwick v. State Board of Education,* Me., 227 A.2d 462 (1967).

By prescribing a warrant form which omits to mention rescissions of bond issues, 20 M.R.S.A. § 225(3) reflects no legislative intention to override this well established doctrine. We view the legislative prescription of a form as merely an excess of caution by the Legislature to avoid voter confusion; it does not purport to restrict such voter authority as is otherwise independently acknowledged to exist.

There were no fatal defects in the warrant of the SAD No. 71 Board of Directors calling the election of January 22, 1975 in which the $5,200,000 bond issue was approved by the people.

The entries are:

In *Herman Cohen, et als v. Wentworth, et al* (chronogically, the second action): *Appeal dismissed.*

In *Herman Cohen v. Ketchum, et al* (chronologically, the first action): *Appeal denied.*

In *Herman Cohen, et als v. Maine School Administrative District No. 71, et al* (chronologically, the third action): *Appeal denied.*

All Justices concurring.